# STATE OF CONNECTICUT *v.* RUSSELL PEELER
## (SC 16380)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued May 21—officially released August 19, 2003

*Glenn W. Falk*, special public defender, with whom, on the brief, was *Pintip Hompluem*, law student intern, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Joseph Corradino*, assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Russell Peeler, appeals, pursuant to General Statutes § 51-199 (b) (3),[1] from the

---

[1] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony,

judgment of conviction, following a jury trial, of attempted murder in violation of General Statutes §§ 53a-49 (a)[2] and 53a-54a (a),[3] two counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (1),[4] and murder in violation of § 53a-54a (a).[5] In this appeal, the defendant claims that the trial court improperly: (1) granted the state's motion to disqualify the defendant's attorney from representing him in violation of his right to secure counsel of his choice under article first, § 8, of the Connecticut constitution, and the sixth amendment to the United States constitution; (2) nullified the defendant's cross-examination of the state's three main witnesses in violation of his sixth amendment right to confrontation and his due process right to a fair trial under the fourteenth amendment to the United States constitution by questioning the witnesses regarding their cooperation with the federal government on federal drug charges and making comments regarding those witnesses and their

or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[4] General Statutes (Rev. to 1997) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

[5] The attempted murder and risk of injury charges arose from one incident in 1997, while the murder charge arose from a separate incident in 1998. Pursuant to a motion by the state, the cases were consolidated for trial.

federal drug proceedings; and (3) violated the defendant's due process right to a fair trial under the fourteenth amendment to the United States constitution by improperly questioning the state's expert witness in connection with the admission of a statement by the victim and by improperly instructing the jury regarding that statement. We agree with the defendant's first claim of trial court impropriety and therefore do not address his remaining claims. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

The record discloses the following undisputed facts and procedural history regarding the two cases underlying this appeal. See footnote 5 of this opinion. In the first case, the state alleged that, on September 2, 1997, in the vicinity of 500 Lindley Street in Bridgeport, the defendant had attempted to murder Rudolph Snead, Jr., his partner in a crack cocaine operation, by shooting at Snead while in his car and that the defendant thereby had committed risk of injury to the two minor children, Leroy Brown, Jr., and Tyree Snead, both seven years of age, who were in the backseat of Snead's car during the shooting. All three of the victims were identified by name in the police arrest warrant affidavit dated September 11, 1997, and in the second substitute information filed January 20, 1998. In the second case, the state alleged that on May 29, 1998, while he was free on bond following his arrest for the drive-by shooting in the first case, the defendant, who had covered his face to conceal his identity, murdered Snead at the Boston Avenue Barbershop in Bridgeport. The defendant was represented initially by Frank Riccio in connection with the first case and, thereafter, by Gary Mastronardi, who filed his appearance on July 23, 1998, in connection with both cases.

Following the consolidation of the two cases, on August 11, 1998, the state filed a motion for a protective

order to preclude disclosure to the defense of the identity of certain witnesses, including the two minor victims, Brown and Tyree Snead. At the hearing on that motion, held on October 6, 1998, the trial court, *Ronan, J.*, provided Mastronardi with two alternatives: (1) the court would order disclosure of the names and addresses of the state's witnesses to Mastronardi, but would prohibit him from disclosing that information to the defendant; or (2) the court would grant the defendant's discovery motion with the names and addresses redacted. The court assured Mastronardi that, prior to trial, he would be able to share the information with the defendant to prepare his defense. Mastronardi advised the court that he knew that there were two minors involved in the drive-by shooting and that he and the defendant already knew their names. On December 9, 1998, the court nevertheless issued an order precluding Mastronardi from disclosing to the defendant the names and addresses of any witnesses who had given statements to the police. Pursuant to that court order, on or about December 23, 1998, senior assistant state's attorney C. Robert Satti, Jr., provided Mastronardi with the statement by Brown regarding the drive-by shooting and filed with the clerk of the court notice of service of disclosure with an attached supplemental disclosure listing, inter alia, the statement given by Brown.

Tragically, on January 7, 1999, Brown and his mother, Karen Clarke, were brutally murdered in their apartment on Earl Avenue in Bridgeport, where they recently had moved. The state thereafter charged the defendant and his brother, Adrian Peeler, in a third case with those murders, and John Walkley filed an appearance as a special public defender for the defendant in connection with the Brown and Clarke murders.[6]

---

[6] The defendant was convicted of two counts of capital felony for the murders of Clarke and Brown and, after a penalty hearing, was sentenced to life without the possibility of release. *State* v. *Peeler*, Superior Court,

On June 9, 1999, the state moved to disqualify Mastronardi from representing the defendant in the two cases involving Snead on the ground that the state intended to call Mastronardi as a witness in the defendant's capital felony case for the murder of Brown and Clarke. Specifically, the motion provided that "[i]t is expected that Attorney Mastronardi will be called as a witness in the [capital felony case] regarding any knowledge on his part regarding the address and location of Karen Clarke and Leroy Brown, Jr. Attorney Mastronardi has spoken to the press and to Judge Ronan regarding a [s]tate's [o]bjection to disclosure of the above [witnesses'] address and statements claiming that he or his client had knowledge of their address before the [s]tate's [m]otion [for a protective order]."

On June 30, 1999, the trial court, *Thim, J.*, held a hearing regarding the state's motion to disqualify Mastronardi. Responding to the motion, Mastronardi contended that the state lacked any ground on which to disqualify him. He advised the court that "Mr. Satti, who is the prosecutor who's handling [the capital felony] case, knows full well that I never had the Earl Avenue address. And I assume that he's told this to [state's attorney Jonathan Benedict]. I've said it ad nauseam since the day this happened. I never had the Earl Avenue address. I never knew where these two people lived. And Mr. Satti's words to me in court one day were: In light of all this, aren't you glad that the state never gave you the Earl Avenue address? Now I don't understand why Mr. Benedict would get up and even suggest something like that in open court on the record when he knows that that's not true. His office never gave the Earl Avenue address to me and I never had

judicial district of Fairfield, Docket No. FBTCR990148396T (June 30, 2000). The defendant's appeal from that judgment and the state's appeal from the sentencing proceeding currently are pending in this court. *State* v. *Peeler*, Docket Nos. SC 16354/SC 16362.

it. I never knew that these people lived on Earl Avenue until I read it in the newspaper and that is an established fact. That's not—Mr. Satti could be called as a witness to establish that. Do we disqualify the state's attorney's office in this case?"

Rather than pursue the claim in its motion that Mastronardi had given the defendant the victims' Earl Avenue address, at the hearing the state contended: "So it's not so much evidence that the state would seek to offer as to the defendant's knowing where they live, but rather what is necessary and most relevant in the double homicide trial is the confirmation that Leroy Brown would indeed be a witness. That in fact is the focal point of the state's evidence as to motive in the double homicide. I'd submit that the argument that the December [1998] disclosure triggered the January [1999] murders is most compelling and that therefore Mr. Mastronardi's testimony in the trial of the double homicide will be most necessary and will not be uncontested."

Mastronardi made several points in response. First, in light of the fact that the state was seeking to deprive the defendant of his constitutional right to counsel of his choice, Mastronardi contended that the state was required to provide him with specific questions it intended to ask and then to establish that it could not get the information it sought from any other source. Second, Mastronardi disputed the claim that the state needed his testimony to establish the fact that Brown's statement had been disclosed to him pursuant to the December 9, 1998 discovery order. Indeed, Mastronardi pointed out that it was undisputed and a matter of public record that a copy of Brown's statement had been turned over to him on December 22, 1998, pursuant to the discovery order. Finally, Mastronardi cautioned that when and how the defendant had gained certain information would, in all likelihood, be privileged and

therefore outside the reach of the state's questions in any event.

Finally, in response the state contended that Mastronardi "suggests that . . . perhaps the state can develop the information it wants to develop through some other avenue. That may well be. I don't know that it is in fact true at this time. But that does not mean the state would then be restricted and deprived of giving Mr. Mastronardi's evidence as well. I think [what] the state seeks to produce with Mr. Mastronardi is already fairly clear from my opening remarks and they all relate, essentially, to what happened in December [of 1998] with notification that . . . Brown was in fact to be a witness." The trial court then granted the state's motion to disqualify Mastronardi, concluding that "one of the core issues in the case is . . . [what] knowledge [the defendant] had about Brown's potential testimony and when and how he obtained that knowledge."

Shortly thereafter, the defendant, through his newly appointed special public defender, Robert Sullivan, filed an opposition to the state's request for a protective order to contest the state's further attempts to withhold witness identities and statements. In support of his motion, the defendant referenced statements made by Mastronardi at the hearing on the protective order held on October 6, 1998, specifically, that Mastronardi had informed the court that the defense already was aware of the identities of the minors and that at least one, if not both, had given the state sworn statements. The defendant also cited an article from the Hartford Courant's Sunday Northeast magazine, dated June 13, 1999, in which Benedict conceded that the court order of December 9, 1998, allowing the defendant's attorney to share with the defendant the contents of the statements, did not result in the identity of the witnesses being revealed to the defense. Specifically, Benedict was quoted in that interview as stating: "One thing

you've got to understand . . . everybody knew everybody. . . . [T]he defense knew their identities even before coming to court." The state presented no evidence at the hearing to contradict that statement.

On August 6, 1999, the trial court granted the state's motion to continue the protective orders and ordered that the state did not have to disclose the subject material until after jury selection had commenced. Additionally, the court, pursuant to a motion by the state, consolidated all of the cases against the defendant with the case against his brother, Adrian Peeler, in connection with the Brown and Clarke homicides. Later, the trial court, *Ford, J.*, granted the defendant's motion to sever the cases against him involving Snead from the capital felony cases against the defendant and his brother involving Brown and Clarke.

Following a jury trial, the defendant was convicted of all four charges in connection with the Snead cases and sentenced to a total effective sentence of 105 years incarceration after the sentence enhancement pursuant to General Statutes § 53-202k was imposed. Thereafter, the defendant was tried for the Brown and Clarke homicides. See footnote 6 of this opinion. During that capital felony trial, the state presented Satti as a witness to testify as to the specifics of the December 9, 1998 discovery order.[7] Satti testified that, pursuant to that order,

---

[7] The questions that the state actually asked Satti and Mastronardi relating to the discovery when given the opportunity are relevant to our resolution of the issue because "a disqualification order, though final, is not independent of the issues to be tried. Its validity cannot be adequately reviewed until trial is complete. The effect of the disqualification on the defense, and hence whether the asserted right has been violated, cannot be fairly assessed until the substance of the prosecution's and defendant's cases is known. In this respect the right claimed by [the] petitioners is analogous to the speedy trial right." *Flanagan* v. *United States*, 465 U.S. 259, 268–69, 104 S. Ct. 1051, 79 L. Ed. 2d 288 (1984); see id., 269 (holding that "a disqualification order does not qualify as an immediately appealable collateral order in a straightforward application of the necessary conditions laid down in prior cases").

he was to turn over witness statements to Mastronardi, who then was permitted to discuss with the defendant the contents of those statements but not to disclose the names of the witnesses who had provided the statements. Mastronardi also related the terms of the trial court's discovery order, confirming that he was permitted to discuss the contents of the statements with the defendant, but not to disclose the identity of the authors of two of the statements. The state never questioned Mastronardi about what, if anything, he in fact had done in connection with the statements pursuant to the court order. Rather, the state questioned Mastronardi about whether, in his career of practicing law, he ever had violated a court order, to which he responded in the negative.

On appeal, the defendant claims that, in the absence of a compelling need for Mastronardi's testimony at the trial involving the Brown and Clarke homicides, the trial court improperly granted the state's motion to disqualify Mastronardi in the Snead cases. The defendant contends that he was denied his constitutional right to counsel of choice under the state and federal constitutions because the state did not demonstrate a compelling need for Mastronardi's testimony.

The state contends in response that Mastronardi's testimony was necessary to help prove the identity of the defendant and the intent needed to establish the defendant's role in the murders, specifically, "that the December 22, 1998 disclosure was a catalyst in the double homicide [of Brown and Clarke]." The state reasons that the defendant did not consider Brown to be a witness until he learned that Brown had given a statement against him. Therefore, the state contends that Mastronardi "was prohibited from revealing to the defendant the names of any witnesses . . . [and that] [o]nly Mastronardi could testify that he scrupulously complied with that [discovery] order."

We agree with the defendant that the record did not demonstrate that the state had met its burden of proving that Mastronardi's testimony was necessary.[8] Accordingly, we conclude that the trial court improperly disqualified Mastronardi in violation of the defendant's constitutional right to counsel of his choice.[9]

We begin with a discussion of the pertinent legal principles that guide our resolution of this issue. It is well settled that the guarantee of assistance of counsel under the sixth amendment to the United States constitution encompasses the right to select one's own attorney. "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell* v. *Alabama*, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932). Statements on this subject stem largely from an appreciation that a primary purpose of the sixth amendment is to grant a criminal defendant effective control over the conduct of his defense. See

[8] The defendant claims that, in deciding whether to disqualify Mastronardi, the trial court should have considered representations by counsel that no conflict existed; see *State* v. *Drakeford*, 261 Conn. 420, 429, 802 A.2d 844 (2002); and whether a stipulation regarding specific facts would have been a proper solution to the state's dilemma. See *State* v. *Crespo*, 246 Conn. 665, 696–97, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). Because we conclude that the state did not demonstrate that Mastronardi's testimony was necessary, we need not address these claims.

[9] The defendant claims that he is entitled to greater protections in this regard under the Connecticut constitution than under the United States constitution. The state contends that, in *State* v. *Webb*, 238 Conn. 389, 413–14 n.23, 680 A.2d 147 (1996), this court rejected the contention that the state constitution affords more extensive rights to counsel than does the federal constitution in the context of conflict free representation. The court in *Webb*, however, limited its review to the federal constitutional claim because the defendant did not present an independent and separate state constitutional analysis. See *State* v. *Vega*, 259 Conn. 374, 384 n.15, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002) (independent state analysis required). In light of our conclusion that the defendant is entitled to relief under the federal constitution, we need not decide whether the state constitution affords greater protection in this regard.

*United States* v. *Nichols*, 841 F.2d 1485, 1502 (10th Cir. 1988); *Wilson* v. *Mintzes*, 761 F.2d 275, 279 n.5 (6th Cir. 1985). As the United States Supreme Court has stated, the sixth amendment "grants to the accused personally the right to make his defense . . . [because] it is he who suffers the consequences if the defense fails." *Faretta* v. *California*, 422 U.S. 806, 819–20, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

A critical aspect of making a defense is choosing the person who serves as one's assistant and representative. "The right to retain private counsel serves to foster the trust between attorney and client that is necessary for the attorney to be a truly effective advocate. . . . Not only are decisions crucial to the defendant's liberty placed in counsel's hands . . . but the defendant's perception of the fairness of the process, and his willingness to acquiesce in its results, depend upon his confidence in his counsel's dedication, loyalty, and ability. . . .

"The right to retain private counsel also serves to assure some modicum of equality between the Government and those it chooses to prosecute. . . . The right to privately chosen and compensated counsel also serves broader institutional interests. The virtual socialization of criminal defense work in this country that would be the result of a widespread abandonment of the right to retain chosen counsel . . . too readily would standardize the provision of criminal-defense services and diminish defense counsel's independence. There is a place in our system of criminal justice for the maverick and the risk taker and for approaches that might not fit into the structured environment of a public defender's office, or that might displease a judge whose preference for nonconfrontational styles of advocacy might influence the judge's appointment decisions. . . . There is also a place for the employment of specialized defense counsel for technical and complex cases . . . . The

choice of counsel is the primary means for the defendant to establish the kind of defense he will put forward. . . . Only a healthy, independent defense bar can be expected to meet the demands of the varied circumstances faced by criminal defendants, and assure that the interests of the individual defendant are not unduly subordinat[ed] . . . to the needs of the system. . . .

"In sum, our chosen system of criminal justice is built upon a truly equal and adversarial presentation of the case, and upon the trust that can exist only when counsel is independent of the Government. Without the right, reasonably exercised, to counsel of choice, the effectiveness of that system is imperiled." (Citations omitted; internal quotation marks omitted.) *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 645–48, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989) (Blackmun, J., dissenting).

"Indeed, it has been said that the most important decision a defendant makes in shaping his defense is his selection of an attorney. . . . A defendant learns about the charges against him, the weaknesses of the government's case, and possible strategies through an attorney. . . . A defendant also allocates authority to make important decisions, some affecting constitutional rights, to an attorney. . . .

"A defendant, then, must have confidence in the attorney who will represent him or her. For the basic trust between counsel and client . . . is a cornerstone of the adversary system. . . . If all attorneys were the same, the choice of an attorney would be of no moment. However, [a]ttorneys are not fungible. . . . Attorneys are different, and their differences can influence the defense presented by a defendant. Therefore, a defendant is afforded an opportunity to select an attorney." (Citations omitted; internal quotation marks omitted.) *United States* v. *Nichols*, supra, 841 F.2d 1502.

We recognize, however, that the right to counsel of choice is not absolute. *United States* v. *Richardson*, 894 F.2d 492, 496 (1st Cir. 1990); *United States* v. *Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988); *Burger & Burger, Inc.* v. *Murren*, 202 Conn. 660, 668, 522 A.2d 812 (1987). When a defendant's selection of counsel seriously endangers the prospect of a fair trial, a trial court justifiably may refuse to agree to the choice. Thus, a trial court may, in certain situations, reject a defendant's choice of counsel on the ground of a potential conflict of interest, because a serious conflict may indeed destroy the integrity of the trial process. *United States* v. *Nichols*, supra, 841 F.2d 1503. Although not absolute, the constitutional right to counsel of one's choice does nevertheless mandate a presumption in favor of accepting a criminal defendant's choice of counsel. *Wheat* v. *United States*, 486 U.S. 153, 164, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); *United States* v. *Baker*, 10 F.3d 1374, 1399 (9th Cir. 1993), cert. denied, 513 U.S. 934, 115 S. Ct. 330, 130 L. Ed. 2d 289 (1994), overruled in part on other grounds, *United States* v. *Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000). This presumption means that a trial court may not reject a defendant's chosen counsel on the ground of a potential conflict of interest without a showing that both the likelihood and the dimensions of the feared conflict are substantial. *State* v. *Crespo*, 246 Conn. 665, 696–97, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Moreover, mere speculation as to a conflict will not suffice. The trial court must examine whether the concern is substantiated and whether that concern outweighs the defendant's right to counsel of his choosing. *Wheat* v. *United States*, supra, 486 U.S. 164 (actual conflict or showing of serious potential for conflict required). Indeed, "[i]f by merely announcing his intention to call opposing counsel as a witness an adversary

could thereby orchestrate that counsel's disqualification under the Disciplinary Rules, such a device might often be employed as a purely tactical maneuver. Clearly, however, these Rules were not designed to be used as tools of litigation strategy. Therefore, whenever an adversary declares his intent to call opposing counsel as a witness, prior to ordering disqualification of counsel, the court should determine whether counsel's testimony is, in fact, genuinely needed. *Connell* v. *Clairol, Inc.*, 440 F. Sup. 17, 18 n.1 (N.D. Ga. 1977)." (Internal quotation marks omitted.) *Atlantic Richfield Co.* v. *Canaan Oil Co.*, 202 Conn. 234, 248–49, 520 A.2d 1008 (1987), overruled on other grounds, *Santopietro* v. *New Haven*, 239 Conn. 207, 213, 682 A.2d 106 (1996).

When either side in a criminal case seeks to call as a witness either a prosecutor or a defense attorney who is or has been professionally involved in the case, that party must demonstrate that the testimony is "necessary and not merely relevant, and that all other available sources of comparably probative evidence have been exhausted." *Ullmann* v. *State*, 230 Conn. 698, 717, 647 A.2d 324 (1994). This "compelling need" test strikes the appropriate balance between, on the one hand, the need for information and, on the other hand, the potential adverse effects on the attorney-client relationship and the judicial process in general. Id., 717–20.

Furthermore, we note that the trial court's decision as to whether a serious potential conflict justifies the disqualification of a defendant's chosen counsel is entitled to deference on appeal. In *Wheat* v. *United States*, supra, 486 U.S. 163, the United States Supreme Court noted that "the [trial] court must be allowed substantial latitude in refusing waivers of conflicts of interest . . . ." The court also noted that the "[trial] court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place,

but in the murkier pretrial context when relationships between parties are seen through a glass, darkly." Id., 162. In his dissent, in which he reiterated a point made by the *Wheat* majority, Justice Marshall cautioned, however, that "the trial court must recognize a presumption in favor of a defendant's counsel of choice. This presumption means that a trial court may not reject a defendant's chosen counsel on the ground of a potential conflict of interest absent a showing that both the likelihood and the dimensions of the feared conflict are substantial. Unsupported or dubious speculation as to a conflict will not suffice. The Government must show a substantial potential for the kind of conflict that would undermine the fairness of the trial process. In these respects, I do not believe my position differs significantly, if at all, from that expressed in the opinion of the Court." Id., 166 (Marshall, J., dissenting).

To overcome the presumption in favor of a defendant's choice of counsel, a disqualification decision by the trial court must, therefore, be based upon "a reasoned determination on the basis of a fully prepared record . . . ." *Fuller* v. *Diesslin*, 868 F.2d 604, 609 n.4 (3d Cir.), cert. denied sub nom. *Perretti* v. *Fuller*, 493 U.S. 873, 110 S. Ct. 203, 107 L. Ed. 2d 156 (1989). Because the interest at stake is nothing less than a criminal defendant's sixth amendment right to counsel of his choice, the trial court cannot vitiate this right without first scrutinizing closely the basis for the claim. Only in this way can a criminal defendant's right to counsel of his choice be appropriately protected.

Finally, it is well settled that if the decision by a trial court deprived a defendant of his constitutional right to counsel of choice, prejudice will be presumed. *Flanagan* v. *United States*, 465 U.S. 259, 268, 104 S. Ct. 1051, 79 L. Ed. 2d 888 (1984) ("[o]btaining reversal for violation of [right to counsel of one's choice] does not require a showing of prejudice to the defense, since the right

reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding"); *United States* v. *Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986) ("denial of a criminal defendant's qualified right to retain counsel of his choice is reversible error regardless [of] whether prejudice is shown"); *State* v. *Mebane*, 204 Conn. 585, 595, 529 A.2d 680 (1987), cert. denied, 484 U.S. 1046, 108 S. Ct. 784, 98 L. Ed. 2d 870 (1988) ("a per se rule of automatic reversal . . . properly vindicates the denial of the defendant's fundamental constitutional right to assistance of counsel guaranteed by the sixth amendment"). Therefore, if the trial court in the present case improperly disqualified Mastronardi, the appropriate remedy is to reverse the judgment of conviction and grant the defendant a new trial with his counsel of choice.

On the basis of the trial court record before us, we conclude that the state failed to demonstrate a compelling need for Mastronardi's testimony. First, because Brown was mentioned by name in both the arrest warrant affidavit and the second substitute information filed in court on January 20, 1998, it is undisputed that his identity as a potential witness and as a victim was known nearly one year before his murder. Second, the notice of service of disclosure of December 23, 1998, filed by the state, constituted a public record that memorialized the release of all of the witnesses' statements to Mastronardi pursuant to the trial court's December 9, 1998 discovery order. Indeed, as Satti's testimony demonstrated, Mastronardi was not the exclusive source of the fact that statements had been disclosed to him. Accordingly, the state never provided the court with specific information that *only* Mastronardi could provide.[10]

---

[10] Because the state never provided the court with the specific information that it wanted to elicit from Mastronardi, the possibility of an attempt to resolve the issue by Mastronardi providing a stipulation would have been illusory.

To the contrary, the state's attorney acknowledged that, "perhaps the state can develop the information it wants to develop through some other avenue. That may well be. I don't know that it is in fact true at this time. But that does not mean the state would then be restricted and deprived of giving Mr. Mastronardi's evidence as well." Necessity, not mere relevance, however, is the touchstone.

At oral argument before this court, however, the state advanced a new theory in support of the trial court's order disqualifying Mastronardi. In specific, the state contended that, prior to December 23, 1998, the defendant did not know that Brown would be an actual witness against him because he believed that a witness was someone who had given a statement to the police and the defendant did not know that Brown had done so until on or about December 23, 1998. In the warrant for the defendant's arrest, the police officer's affidavit recited that, after the drive-by shooting involving Snead, "[b]oth children were traumatized and were unwilling to talk about the incident." Therefore, according to the state, Mastronardi's testimony was needed to establish that the defendant learned of Brown's statement on or about December 23, 1998, thereby allowing the jury to infer that the defendant was responsible for the deaths of Brown and Clarke on January 7, 1999.

As we previously noted, however, the state never argued to the trial court that Mastronardi's testimony was necessary because only he could testify that he had given the defendant any witness statements or that he had shared their contents with the defendant. Moreover, even when given the opportunity to question Mastronardi, the state never asked him about what, if anything, he did in connection with any of the statements he had been given pursuant to the court order. See footnote 7 of this opinion. As a result, like Satti, Mastronardi merely related the terms of the trial court's

discovery order, confirming that he was permitted to discuss the contents of any statements with the defendant, but not to disclose the identity of the authors of two of the statements. In fact, the only questions the state asked Mastronardi pertained to the unusual nature of the court order and whether he ever had violated an order of the court, to which he responded in the negative.[11] Under the particular circumstances of this case, because the state did not demonstrate the compelling need for Mastronardi's testimony; see *Ullmann* v. *State*, supra, 230 Conn. 717; the appropriate remedy for this court is to order a new trial. *State* v. *Mebane*, supra, 204 Conn. 595.

The judgment is reversed and the case is remanded for a new trial.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

ZARELLA, J., dissenting. The majority concludes that "the record did not demonstrate that the state had met its burden of proving that [the testimony of one of the defendant's attorneys, Gary Mastronardi] was necessary." The majority therefore concludes that "the trial court improperly disqualified Mastronardi in violation of the defendant's constitutional right.to counsel of his choice." I disagree with the majority and, therefore, dissent.[1]

---

[11] The dissent's argument distills to its determination that, as the state asserts, the trial court reasonably could have found that the state had a compelling need to call Mastronardi as a witness to establish whether he had supplied the defendant with information in violation of an explicit court order. For all the reasons that we already have enumerated, we simply disagree.

[1] Because I conclude that the trial court did not abuse its discretion in granting the state's motion to disqualify Mastronardi, I need not reach the issue of whether the violation of a defendant's qualified right to counsel of choice is per se prejudicial, thereby requiring automatic reversal of that defendant's conviction. I feel compelled to note, however, that, contrary to the majority's assertion, the issue of whether the violation of a defendant's qualified right to counsel of choice requires automatic reversal is not well

As the majority correctly notes, the trial court's determination of whether an attorney should be disqualified on the basis of an actual conflict or serious potential

settled. Rather, as a federal appellate court has noted in a case that the majority cites in support of its assertion that prejudice is to be presumed when a defendant is deprived of his constitutional right to retained counsel, the United States Supreme Court has yet to rule on whether the denial of this qualified constitutional right is "structural" and, thus, impervious to harmless error analysis. See *United States* v. *Washington*, 797 F.2d 1461, 1467 n.7 (9th Cir. 1986).

Moreover, at least one federal circuit court of appeals has rejected this rule of automatic reversal; that court has concluded that, in order to obtain a new trial, a defendant who improperly has been denied the right to counsel of choice must demonstrate prejudice. *United States* v. *Turk*, 870 F.2d 1304, 1308 (7th Cir. 1989); cf. *United States* v. *Voigt*, 89 F.3d 1050, 1074 (3d Cir.), cert. denied, 519 U.S. 1047, 117 S. Ct. 623, 136 L. Ed. 2d 546 (1996) ("nonarbitrary, but erroneous, denial" of right to counsel of choice may be subject to harmless error analysis [internal quotation marks omitted]).

Although I need not reach this issue, I do maintain that, contrary to the suggestion of the majority, the issue of whether the denial of a defendant's right to retained counsel is per se prejudicial or subject to harmless error analysis is far from clear and deserves a more comprehensive appraisal than that which the majority has provided. As Richard A. Posner, former chief judge of the Seventh Circuit Court of Appeals recently has noted: "That denying the counsel of one's choice falls into either category [namely, a structural error requiring automatic reversal or a nonstructural error lending itself to harmless error analysis] is not an easy position to maintain . . . after . . . *Turk* . . . which says that proof of prejudice is required in a case in which the defendant is complaining of such a denial. . . . Most cases hold [to] the contrary, however, such as *United States* v. *Rankin*, 779 F.2d 956, 960–61 (3d Cir. 1986), which relies on *Flanagan* v. *United States*, 465 U.S. 259, 267–68, 104 S. Ct. 1051, 79 L. Ed. 2d 288 (1984)—not cited in *Turk*—[in which] the [United States] Supreme Court intimated that obtaining a reversal of a conviction because of the denial of the defendant's right to a lawyer of his choice does not require a showing of prejudice to the defense, since the right reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding. A number of cases line up with *Rankin*. . . .

"The language . . . from *Flanagan* suggests that the right to counsel of one's choice falls into the . . . subcategory of structural errors that we have identified. Subsequent cases, however, of which the most recent is *Neder* v. *United States*, [527 U.S. 1, 8–9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)], contain language that, consistent with the limited and qualified nature of the right to counsel of one's choice . . . seems to confine the rule of automatic reversal of denials of the right to assistance of counsel to cases of complete denial. . . . That a district [court] has . . . broad

for a conflict is subject to the highly deferential abuse of discretion standard of review. "The Superior Court has inherent and statutory authority to regulate the conduct of attorneys who are officers of the court. . . . In its execution of this duty, the Superior Court has broad discretionary power to determine whether an attorney should be disqualified for an alleged . . . conflict of interest. . . . In determining whether the Superior Court has abused its discretion in [ruling on] a motion to disqualify, this court must accord every reasonable presumption in favor of its decision. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted.) *State* v. *Jones*, 180 Conn. 443, 448, 429 A.2d 936 (1980), overruled in part on other grounds,

discretion to extinguish the right to counsel of one's choice for reasons of calendar control suggests that this right, which in any event no indigent criminal defendant has . . . is, like the right to effective assistance of counsel (a right whose vindication requires proof of prejudice . . . ), not so fundamental as the rights protected by the rule of automatic reversal.

"The strongest argument for bringing the right to counsel of one's choice under that [automatic reversal] rule is practical, and also resembles a part at least of the rationale for the first class of structural errors. Prejudice will not be provable unless the replacement counsel failed to render effective assistance, an independent constitutional violation, and so the right to the lawyer of one's choice will be empty because unenforceable—had the district [court] disqualified [defense counsel] because [defense counsel] parts his hair on the right side [the defendant] would have no remedy. But this argument is overstated in at least two respects. First, it will sometimes be possible to prove prejudice even though the replacement lawyer didn't render ineffective assistance. If he is inexperienced, or lacks some specialized knowledge that the defendant's original choice of lawyer had, it may be possible to show that even though his representation of the defendant was not ineffective it was substantially less likely to achieve acquittal. Second, and more important, mandamus is an available remedy when an abuse of discretion by the trial judge cannot effectively be remedied by appealing the final decision . . . for example an abuse of discretion in disqualifying a party's lawyer." (Citations omitted; internal quotation marks omitted.) *United States* v. *Santos*, 201 F.3d 953, 960–61 (7th Cir. 2000). Thus, in light of the unsettled nature of this issue and the shifting perspective of United States Supreme Court precedent, I believe that this issue deserves more attention than it has been given.

*State* v. *Powell,* 186 Conn. 547, 555, 442 A.2d 939, cert. denied sub nom. *Moeller* v. *Connecticut,* 459 U.S. 838, 103 S. Ct. 85, 74 L. Ed. 2d 80 (1982);[2] see also *State* v. *Webb,* 238 Conn. 389, 417, 680 A.2d 147 (1996); *Walton* v. *Commissioner of Correction,* 57 Conn. App. 511, 515, 749 A.2d 666, cert. denied, 254 Conn. 913, 759 A.2d 509 (2000); *Fiddelman* v. *Redmon,* 31 Conn. App. 201, 210, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993); 3 W. LaFave et al., Criminal Procedure (2d Ed. 1999) § 11.9 (c), p. 676 n.98 (listing federal cases applying same standard of review). Moreover, "[t]he ultimate issue is whether the trial court could reasonably have reached the conclusion that it did." *State* v. *Jennings,* 216 Conn. 647, 655, 583 A.2d 915 (1990). The high degree of deference afforded to the trial court's ruling is an important factor in reaching a decision on the issue presented.

The majority properly stresses that a criminal defendant has a qualified[3] constitutional right to be represented by counsel of choice. See, e.g., *Wheat* v. *United States,* 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); see also 3 W. LaFave, supra, § 11.4 (c), pp.

---

[2] "In *State* v. *Powell,* [supra, 186 Conn. 555], this court overruled the implicit conclusion of the court in *State* v. *Jones,* supra, 180 Conn. 443, that the denial of a motion to disqualify is a final judgment subject to immediate appeal. Our decision in *Powell,* however, did not prompt us to modify our substantive holding concerning the conflict of interest issue in *Jones* and, moreover, we subsequently [adhered to] that holding in *State* v. *Jones,* 193 Conn. 70, 92, 475 A.2d 1087 (1984)." *State* v. *Webb,* 238 Conn. 389, 418–19 n.28, 680 A.2d 147 (1996).

[3] A defendant's right to be represented by counsel of choice is a "qualified" right in the sense that it can be "circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the [g]overnment." *Wheat* v. *United States,* 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

557–58.[4] What the majority fails to emphasize, however, is that "the purpose of providing assistance of counsel is simply to ensure that criminal defendants receive a fair trial . . . and that in evaluating [s]ixth [a]mendment claims, the appropriate inquiry focuses on the adversarial process, *not on the accused's relationship with his lawyer as such*. . . . Thus, while the right to select and [to] be represented by one's preferred attorney is comprehended by the [s]ixth [a]mendment, the essential aim of th[at] [a]mendment is to *guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers*." (Citations omitted; emphasis added; internal quotation marks omitted.) *Wheat* v. *United States*, supra, 159. Because the right to counsel of choice is a *qualified* constitutional right, the trial court "must recognize a presumption in favor of [the defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but [also] by a showing of a serious potential for conflict." Id., 164; accord *United States* v. *Register*, 182 F.3d 820, 829 (11th

---

[4] The majority cites *State* v. *Crespo*, 246 Conn. 665, 696–97, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999), for the proposition that "a trial court may not reject a defendant's chosen counsel on the ground of a potential conflict of interest without a showing that both the likelihood and the dimensions of the feared conflict are substantial." I would conclude that the majority's reliance on *Crespo* is inapt. In that case, this court was called upon to determine whether the record presented facts sufficient to conclude that the trial court *should have known*, in the absence of an objection by either the state or the defendant, that a potential conflict existed, which would have given rise to a duty to inquire. See id., 694. In the present case, the issue is whether the trial court, *which was presented with information regarding a potential conflict*, properly concluded that such a potential conflict existed. As I indicate elsewhere in my dissenting opinion, I believe that the proper standard for determining whether the presumption favoring a defendant's right to counsel of choice is overcome is that articulated by the United States Supreme Court in *Wheat* v. *United States*, supra, 486 U.S. 164, namely, whether there is an actual conflict or "a serious potential for conflict."

Cir. 1999), cert. denied, 530 U.S. 1250, 120 S. Ct. 2703, 147 L. Ed. 2d 973 (2000); *United States* v. *Voigt*, 89 F.3d 1050, 1076 (3d Cir.), cert. denied, 519 U.S. 1047, 117 S. Ct. 623, 136 L. Ed. 2d 546 (1996); *Serra* v. *Michigan Dept. of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993), cert. denied sub nom. *Serra* v. *Toombs*, 510 U.S. 1201, 114 S. Ct. 1317, 127 L. Ed. 2d 666 (1994); *United States* v. *Vasquez*, 995 F.2d 40, 42 (5th Cir. 1993); *United States* v. *Spears*, 965 F.2d 262, 274–75 (7th Cir. 1992).[5]

The majority relies on *Ullman* v. *State*, 230 Conn. 698, 717, 647 A.2d 324 (1994), for its proposition that the state "must demonstrate [as a precondition to calling

---

[5] In the present case, the fact that the state's attorney intended to call Mastronardi to testify about his compliance or *noncompliance* with a court order—the latter of which possibly resulted in the murder of two witnesses—was relevant to the court's determination of a serious potential for conflict. Therefore, it is important to note that "[t]he conflict here is not the more usual one of multiple representation. . . . Rather, counsel has been placed in the position of having to worry about allegations of his own misconduct. . . . [W]hat could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?" (Citations omitted; internal quotation marks omitted.) *United States* v. *Arrington*, 867 F.2d 122, 129 (2d Cir.), cert. denied sub nom. *Davis* v. *United States*, 493 U.S. 817, 110 S. Ct. 70, 107 L. Ed. 2d 37 (1989).

Moreover, as the state's attorney correctly pointed out at the hearing on the state's motion to disqualify, the decision to disqualify Mastronardi was not one that could wait until trial had commenced. The state's attorney argued: "I'd submit this is not a conflict that can be resolved later on in the middle of a trial involving a death qualifying capital case. It's really something that has to be done up front right now. I submit that the risk that . . . Mastronardi will testify is great. In fact, it's almost a definite thing. . . . I'm representing the state of Connecticut as the state's attorney here in a serious case, a capital case. As an oppos[ing] . . . party, I think it would be completely inappropriate, unfair for me to be confronting as a witness and as an attorney in both categories one individual."

Inasmuch as the defendant was charged with multiple felony offenses, and, therefore, any disqualification of his attorney close to the commencement of or during trial would have prejudiced him in a correspondingly serious manner, it was critical that the decision to disqualify Mastronardi be made earlier rather than later. Moreover, I believe that the foregoing argument of the state's attorney indicates that there was no reason for the trial court to be concerned that the state's attorney was attempting to manufacture a conflict. See footnote 6 of this opinion.

defense counsel as a witness] that [defense counsel's] testimony is necessary and not merely relevant, and that all other available sources of comparably probative evidence have been exhausted." (Internal quotation marks omitted.) *Ullman*, however, did not involve a defendant's sixth amendment right to counsel of choice. Rather, the issue in *Ullman* was whether the trial court had abused its discretion in ordering a public defender to testify for the state in a criminal trial against his former client. Id., 699–700, 715. My research has not revealed a single case in which a court has held that a party moving to disqualify counsel on the basis of an actual or potential conflict of interest must establish a compelling need.[6] I believe, however, that, qualified or

---

[6] At least one federal circuit court of appeals has indicated, in the context of determining whether certain defendants were denied a fair trial when one of their defense counsel was called by the prosecutor as a witness, that the prosecutor must show that the information sought to be obtained from defense counsel's testimony "is both necessary and unobtainable from other sources." *United States* v. *Crockett*, 506 F.2d 759, 760 (5th Cir.), cert. denied, 423 U.S. 824, 96 S. Ct. 37, 46 L. Ed. 2d 40 (1975). Another circuit court of appeals has noted, however, that that statement in *Crockett* is dictum. *United States* v. *Cortellesso*, 663 F.2d 361, 363 (1st Cir. 1981). I believe that the approach taken by the United States Circuit Court of Appeals for the First Circuit is the more sensible approach and properly balances the competing interests of the state, in its endeavor to put on its best case, and the defendant, who clearly has an interest in retaining counsel of his choice.

In *United States* v. *Cortellesso*, supra, 663 F.2d 361, the First Circuit was presented with a situation in which the prosecutor planned to call defense counsel as a witness to testify about a conversation in which he had engaged with government agents. Id., 362. The defendant claimed that the prosecutor should have been required to call the other participants in the conversation rather than defense counsel himself, citing *Crockett* for the proposition that if the information can be obtained from other sources, then the prosecutor cannot call defense counsel to testify. Id., 363. The court in *Cortellesso* disagreed, stating that "[t]he government was not required to accede to this truncation of its evidence. We do not accept the dictum in . . . *Crockett* . . . that the government must show that the evidence is unobtainable from other sources, if it means that the government must settle for less than its best evidence." (Internal quotation marks omitted.) Id. The court in *Cortellesso* seemed particularly concerned with the prospect of requiring the prosecutor to rely on sources other than defense counsel's testimony inasmuch as such reliance, under the circumstances, likely would have undermined the strength of the government's case. See id.

not, a defendant's constitutional right to counsel of his choice deserves due deference. Moreover, I believe that, in the present case, the state has demonstrated "that

The First Circuit fleshed out this "best evidence" rule and its application in subsequent cases in which defense counsel had offered to stipulate to the information sought by the government. In *United States* v. *Diozzi*, 807 F.2d 10 (1st Cir. 1986), the court concluded that if defense counsel or a defendant offers to stipulate to the information sought by the government, and such information is independently verifiable and already in evidence— in that case, written statements made by the defendants through their attorneys—then such stipulation is equivalent to the government's best evidence. See id., 13. It is important to note that the court in *Diozzi* may have been troubled by the fact that the prosecutor in that case did not seek to disqualify defense counsel until six days before trial, which raises the specter of an attempt on the part of the prosecutor to manufacture a conflict. See *United States* v. *Defazio*, 899 F.2d 626, 632 (1st Cir. 1990); see also 3 W. LaFave, supra, § 11.9 (c), p. 677 n.103 ("Appellate courts have noted . . . that to ensure against what *Wheat* described as government attempts to manufacture a conflict, the trial court should seek to determine whether the testimony of counsel is truly needed (in particular, whether the prosecution could establish the same facts through other means). . . . At the same time . . . the government should not be forced to settle for less than its best evidence." [Citations omitted; internal quotation marks omitted.]).

In *United States* v. *Defazio*, supra, 899 F.2d 632, the First Circuit again addressed the issue of whether a stipulation would amount to less than the government's best evidence. In that case, that court concluded that when the information sought by the government is not independently verifiable and is "only in the ken of [defense counsel] and the defendant"; id.; a stipulation amounts to less than the government's best evidence. Thus, it was proper for the district court to have disqualified defense counsel because he potentially could have been called to testify for the government. See id.

I would suggest that the foregoing cases set forth a more sensible approach than the "compelling need" test. In situations in which a stipulation is feasible, namely, when the information sought is independently verifiable, or when resort to other sources will not unduly undermine the strength of the government's case, the government should be required to use means other than defense counsel's testimony to bring the information it seeks before the fact finder. When the information sought, however, is within the knowledge of only defense counsel or defense counsel and the defendant, or when resort to other sources of the information will unduly undermine the strength of the government's case, the government should be allowed to call defense counsel as a witness. In any event, regardless of whether this court adopts the well reasoned "best evidence" approach or the more rigorous "compelling need" test, I believe that, in the present case, the state has sustained its burden of showing that Mastronardi was the only source available for the information that it had sought.

all other available sources of comparably probative evidence have been exhausted." Id., 717. Therefore, I will not quibble with the majority's assertion that the state must establish a compelling need for defense counsel's testimony.

In the present case, there were three sets of criminal charges filed against the defendant, one for the attempted murder of Rudolph Snead, Jr., another for the murder of Snead and a third for the murders of Leroy Brown, Jr., whom the state had planned to call as a witness in the prosecution of the defendant for attempting to murder Snead, and Brown's mother, Karen Clarke. Mastronardi, whom the defendant privately retained as counsel, appeared on behalf of the defendant in connection with the attempted murder and murder charges in the "Snead" cases.[7] The state moved to consolidate the murder and attempted murder charges on July 27, 1998. That motion was granted on August 12, 1998. On June 3, 1999, the state filed a motion to disqualify Mastronardi. In its motion to disqualify, the state indicated that it had filed a motion to consolidate the two previously consolidated charges with the charges filed in connection with the double murder of Brown and Clarke. The state's motion to disqualify was granted on June 30, 1999. The motion to consolidate the double murder charges filed in the "Brown and Clarke" case and the attempted murder and murder charges filed in the "Snead" cases was granted on August 6, 1999.[8]

---

[7] Frank Riccio, whom the defendant also retained as counsel, initially appeared on behalf of the defendant in the case involving the attempted murder of Snead. John Walkley appeared on the defendant's behalf as a special public defender in connection with the case involving the murders of Brown and Clarke.

[8] Subsequently, on August 16, 1999, the defendant's motion to sever the charges filed in the "Snead" cases from the charges filed in the "Brown and Clarke" case was granted.

At the hearing on the motion to disqualify, the state's attorney offered two reasons why Mastronardi's testimony was "necessary and not merely relevant"; (internal quotation marks omitted) id.; to the prosecution of the double murder charges. The first reason was that Mastronardi's testimony was necessary to demonstrate that, at some point before Brown had been murdered, the defendant discovered that Brown was going to be called as a witness in connection with the state's prosecution of the defendant for the attempted murder of Snead. The second reason was that Mastronardi's testimony was necessary to show how the defendant obtained that information. The trial court thus was confronted with the possibility that Mastronardi would be called as a witness at the defendant's trial.

The record in this case reveals that the arrest warrant affidavit in the case involving the attempted murder of Snead contained the names, but not the addresses, of two children, namely, Brown and Tyree Snead, both of whom purportedly witnessed the defendant's unsuccessful attempt to kill Snead. The record further reveals that Mastronardi was in possession of this information prior to the filing of any discovery requests. It is unknown whether the defendant learned of the names of these child eyewitnesses from the affidavit. The affidavit did state that "[b]oth children appeared traumatized and were *unwilling to talk about the incident.*" (Emphasis added.) It is clear that the word "children" referred to Brown and Tyree Snead. Therefore, the only relevant information that the defendant could have possessed prior to the state's December 23, 1998 disclosure of a witness list, Brown's address and Brown's June 7, 1998 statement to the police, was Brown's name and the fact that he was unwilling to talk about the incident. It is also clear that, prior to December 23, 1998, the state had provided neither the defendant nor defense counsel with any information regarding the addresses

of witnesses, the actual list of state witnesses or Brown's statement.

On December 23, 1998, the state disclosed to Mastronardi its witness list, Brown's address and Brown's statement to the police. On December 9, 1998, two weeks prior to the state's disclosure of this information, the trial court had issued a protective order prohibiting Mastronardi from disclosing the names or addresses of witnesses, including Brown. Thus, it was at this point, for the first time, that the defendant had potential access to Brown's address, the fact that Brown had given a statement to the police, and the fact that the state would be calling Brown to testify against the defendant in connection with the attempted murder charge. Whether the defendant actually had learned of these facts depended *solely* upon whether Mastronardi had adhered to the dictates of the protective order. The state argued that this was a critical fact because, on January 7, 1999, approximately two weeks after the information was disclosed to Mastronardi, Brown and Clarke were murdered.

At the hearing on the motion to disqualify, Mastronardi confirmed that neither he nor his client knew the address of Brown. It can reasonably be assumed that, in so stating, Mastronardi meant that he did not know Brown's address until the state had disclosed that address to him on December 23, 1998, especially in view of the fact that the court's protective order clearly prohibited Mastronardi from disclosing the addresses of the state's witnesses, including Brown. Mastronardi also confirmed that he did not receive Brown's statement or the witness list until they were disclosed, under protective order, on December 23, 1998.

The majority concludes that "the state never provided the court with specific information that *only* Mastronardi could provide." (Emphasis in original.) In addi-

tion, the majority declares that "the state never argued to the trial court that Mastronardi's testimony was necessary because only he could testify that he had given the defendant any witness statements or that he had shared their contents with the defendant. Moreover, even when given the opportunity to question Mastronardi, the state never asked him about what, if anything, he did in connection with any of the statements he had been given pursuant to the court order." I disagree.

Regardless of whether Mastronardi disclosed Brown's address to the defendant, *the fact* that Brown had given a statement to the police and that Brown would be testifying for the state was information that *only* Mastronardi could have provided to the defendant.[9] Moreover, while the defendant knew who Brown was and knew that he was riding in Snead's car when the defendant first attempted to murder Snead, only the state had knowledge of Brown's address and the fact that Brown had given a statement to police[10] prior to the state's disclosure of that information to Mastro-

---

[9] The majority appears to conclude that, because there were other witnesses to testify that: (1) the information was not disclosed until two weeks before the murder of Brown and Clarke; (2) prior to disclosure to Mastronardi, the state had not disclosed this information to anyone else; and (3) Mastronardi was the only recipient of this information, the jury then could infer that Mastronardi may have been the source of the defendant's knowledge. Irrespective of the fact that the presiding judge would have been unlikely to allow the state to call into question the ethics of defense counsel at the defendant's trial, a requirement that the state prove its case by inference simply is not a sufficient basis on which to conclude that there did not exist a compelling need for Mastronardi's testimony. The state was entitled to call Mastronardi as a witness and ask him if he was, in fact, the source of the defendant's knowledge—a question that only Mastronardi and the defendant knew the answer to—and let his credibility be judged. Moreover, I would conclude that the state was entitled to put on its best evidence. See footnote 6 of this opinion.

[10] Of course, Brown, himself, and Clarke, Brown's mother, had knowledge of this information, but there is no indication that they did provide or had any incentive to provide this information to the defendant or any persons associated with the defendant.

nardi on December 23, 1998. There was no evidence presented at the hearing on the motion to disqualify or otherwise to suggest that the source from which the defendant obtained this information was anyone other than Mastronardi or Brown himself, and the state clearly was unable to call Brown as a witness. Thus, it was necessary, if not critical, that the state inquire of Mastronardi whether he had violated the court's protective order in order to establish the source of the defendant's information.

The state's attorney brought this matter to the attention of the trial court at the hearing on the motion to disqualify. At that hearing, the state's attorney informed the court that "[t]he testimony that [the defendant] was aware of where the victims lived . . . is extremely relevant and I'd submit that, therefore, whatever . . . Mastronardi had testified to or [will] be called to testify [to] on the homicides that he had passed on the information of the Earl Avenue address or, on the other hand, that he didn't. . . . I think what's more extremely important here and what the state certainly intends to pursue at length [at] trial is did [the defendant] know that . . . Brown was, in fact, to be a witness in the cases that were pending against him up to the date of January 7th of [1999, the date on which Brown was murdered]. And, secondly, how did [the defendant] know that . . . Brown was to be a witness, not merely the fact that [the defendant] may or may not have known that . . . Brown was present in an automobile at the time of the initial case here, which is one of the cases we're dealing with, which is the drive-by shooting [of] . . . Snead that did not result in a homicide. But the fact that the state indeed contemplated, planned and listed . . . Brown as an actual witness in the Snead shooting and homicide trials, the fact is the statement of . . . Brown and his listing as a witness in those cases w[ere] never disclosed or made know[n] to any-

body until December 22nd or thereabouts when [C. Robert Satti, Jr., senior assistant state's attorney] filed a response to the [defendant's] discovery demand." The foregoing statements demonstrate that the state's attorney planned to call Mastronardi as a witness in the consolidated criminal trials to determine whether he had violated the court's December 9, 1998 protective order, a fact of which only Mastronardi and the defendant had knowledge.[11]

At trial, the state's attorney questioned Mastronardi at length about the protective order issued in connection with state's disclosure of the witness list and Brown's statement. The state asked Mastronardi: "Have you ever, in your career, ever violated any court order that was placed on you?" The reference to "court order" clearly included the protective order at issue in this case. Mastronardi replied: "I would never violate an order of the court." While it may be true that the state's case would have been aided by an affirmative response to that question, the test is not whether Mastronardi's testimony ultimately bolsters the state's case, a determination that cannot be made without the benefit of hindsight, but, rather, whether there is a compelling need

---

[11] The majority makes much of the fact that the state's attorney informed the court at the hearing on the state's motion to disqualify that, "perhaps the state can develop the information it wants to develop through some other avenue. That may well be. I don't know that it is in fact true at this time." What the majority fails to mention, however, is that this statement was made in direct response to Mastronardi's incorrect assertion that the information sought by the state constituted uncontested matters, namely, that Mastronardi "never had [Brown's] address" and that Brown's statement was not disclosed to Mastronardi until December 23, 1998. The fact remains, however, that the knowledge of what Mastronardi did with the information when it was disclosed to him is knowledge that resided exclusively with Mastronardi. Indeed, the trial court fully appreciated that Mastronardi was the only source of this information. The court stated that "one of the core issues in the case is [what] knowledge [the defendant] had about . . . Brown's potential testimony and when and how he obtained that knowledge."

for that testimony. If Mastronardi had answered the question in the affirmative, that answer would have supported an inference that the defendant knew for the first time, on or after December 23, 1998, and shortly before Brown was murdered, that Brown lived on Earl Avenue and had given a statement to the police, and that the state was planning to call Brown to testify against the defendant at the defendant's trial. The fact that Mastronardi's answer ultimately was not helpful to the state is irrelevant to the issue of whether there existed a serious potential for a conflict of interest that would have warranted Mastronardi's disqualification. Indeed, whether defense counsel *ultimately* testifies at trial is irrelevant because "we do not review the [trial court's] decision with the advantage of hindsight." *United States* v. *Defazio*, 899 F.2d 626, 631 (7th Cir. 1990).

Based on the foregoing, I would conclude that the state adequately had established that Mastronardi's testimony was "necessary and not merely relevant"; (internal quotation marks omitted) *Ullman* v. *State*, supra, 230 Conn. 717; and, consequently, there was a compelling need for Mastronardi's testimony at the defendant's trial. This compelling need for Mastronardi's testimony demonstrated a "serious potential for conflict"; *Wheat* v. *United States*, supra, 486 U.S. 164; sufficient to overcome the "presumption in favor of [the defendant's right to] counsel of choice . . . .". Id. Accordingly, I cannot conclude that the trial court abused its discretion in granting the state's motion to disqualify Mastronardi and, therefore, I respectfully dissent.