******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LUIS RODRIGUEZ
## (SC 18945)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.*

*Argued May 14, 2013—officially released January 28, 2014*

*Elizabeth M. Inkster*, assigned counsel, and *Kelly M. Berwick*, deputy assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following an incident in which the defendant, Luis Rodriguez, stabbed and seriously wounded the victim, Angel Salvador Diaz, a jury found the defendant guilty of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] The trial court rendered judgment in accordance with the jury verdict,[2] and the defendant appealed to the Appellate Court, claiming that the trial court improperly had permitted Diaz' attorney to testify about an immunity agreement that he had negotiated with the state on behalf of Diaz. See *State* v. *Rodriguez*, 133 Conn. App. 721, 728–32, 36 A.3d 724 (2012). The Appellate Court rejected the defendant's claim and affirmed the judgment of the trial court; id., 732; and we granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court acted within its discretion in permitting testimony from the attorney for [Diaz]?" *State* v. *Rodriguez*, 304 Conn. 915, 40 A.3d 784 (2012). We need not resolve this issue, however, because, even if we assume, without deciding, that the trial court improperly permitted Diaz' attorney to testify, the admission of his testimony was harmless. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "On February 7, 2008, Diaz was working at the Brook Street Market [market] in [the city of] Hartford . . . with two other employees, William Ramirez and Franklin Ramirez. . . . Diaz, William Ramirez and Franklin Ramirez [knew the defendant] because he lived in the neighborhood and frequented the market where the three men worked. On the afternoon of February 7, 2008, the defendant entered the market and asked Diaz if he could borrow [$20] from him. Diaz gave the defendant a [$20] bill. The defendant exchanged the [$20] bill for twenty [$1] bills. Then, as patrons entered the market, the defendant handed them one or two of the [$1] bills. After giving away all of the bills, the defendant left the market. He returned a short time later and asked Diaz if he could borrow [another $20]. Diaz refused. The defendant told Diaz, 'fine, we're not friends anymore. . . . I'm Espana; you're going to see what's going to happen,' and left the market.

"At approximately [10:15 p.m. that same day], Diaz and William Ramirez took garbage out to a dumpster located in an alley behind the market. As Diaz was depositing garbage into the dumpster, the defendant [who apparently had been lying in wait for Diaz] stabbed Diaz twice in his left side with a knife. After stabbing Diaz, the defendant ran away with the knife in his hand. Diaz returned to the market and, while bleeding profusely, told Franklin Ramirez that the defendant had stabbed him." *State* v. *Rodriguez*, supra, 133 Conn.

App. 723.

"[I]mmediately following the attack on Diaz, police responded to the market. . . . Diaz told [one of the responding officers] . . . that 'he was approached by two black males . . . [that] they demanded his wallet . . . [that Diaz] declined and [that] one of the black males stabbed him.' When asked by the officer whether he could identify his attackers, Diaz stated that he could not. During this brief exchange, Diaz was 'distraught' and 'had a blank look on his face.' " Id., 724. Neither William Ramirez nor Franklin Ramirez informed the officers what they had observed that evening regarding the defendant's involvement in Diaz' assault. Thereafter, "Diaz [underwent] emergency surgery and was hospitalized for a period of approximately five weeks as a result of the injuries [that] he sustained during the attack.

"On February 16, 2008, nine days after the attack on Diaz, the defendant returned to the market. William Ramirez and Franklin Ramirez were working at the market that day. The defendant, who was intoxicated, threatened William Ramirez . . . and made a gesture [by running] his finger across his [own] neck. The defendant stated to the two men that he had stabbed Diaz. Police were called to the market and arrested the defendant, who was belligerent, resisted arrest and threatened the arresting officer." Id., 723–24.

"On March 19, 2008, after he was released from the hospital, Diaz [who had heard from others that the defendant intended to find and kill him] went to the police station and met with a detective. Diaz [disclaimed his earlier statements to the police and] stated that he could identify his attacker, whom he called 'Espana,' and gave a written statement to the detective. The detective presented Diaz with an array of eight photographs, from which Diaz identified . . . the defendant [as the person who had stabbed him]." Id., 725. The defendant subsequently was arrested and charged with assault in the first degree, threatening in the second degree, and interfering with an officer. See footnote 1 of this opinion and accompanying text.

On the eve of the defendant's trial, the assistant state's attorney discovered that Diaz, a citizen of the Dominican Republic, was not a legal resident of the United States.[3] In addition, over a period of four years, Diaz had been using the social security card of a United States citizen named Juan Suarez to obtain more than $250,000 in treatment for medical problems both related and unrelated to the injuries that he had sustained from the stabbing.[4] Attorney Aaron Romano was appointed to advise Diaz of his rights and to counsel him in light his exposure to prosecution for identity theft and immigration violations. Romano ultimately negotiated an agreement with the state pursuant to which the state agreed (1) to grant Diaz immunity from prosecution for any fraud or identity theft that he may have committed

while impersonating Suarez, (2) not to share any such information with any other state or federal agency, and (3) to assist Diaz in obtaining United States citizenship. In return, Diaz promised to testify truthfully for the state at the defendant's trial.

At trial, William Ramirez testified that, on the night of February 7, 2008, he was with Diaz near the dumpster in the alley outside of the market when he heard Diaz exclaim that he had been stabbed and, immediately thereafter, saw the defendant run out of the alley with a knife in his hand. Franklin Ramirez, who was inside the market when Diaz was stabbed, testified that, after Diaz was assaulted, he came into the market and stated that "Espana" had stabbed him. Franklin Ramirez also testified that, on February 16, 2008, the defendant, who had returned to the market, stated openly that he had stabbed Diaz. Diaz testified about the stabbing and the events leading up to it, and he also made an in-court identification of the defendant as his assailant. Diaz also admitted to using a false identity to obtain valuable medical services; he acknowledged that, under the express terms of the immunity agreement, his cooperation with the state shielded him from prosecution for that fraud, and he denied initially informing the police that he was confronted by two black males.

Following Diaz' testimony, the state sought to call Romano as a witness. According to the state, Romano's testimony was relevant because Diaz had been unable to provide the jury with a coherent explanation about his agreement with the state, and the state claimed that Romano's testimony would assist the jury in understanding the nature and scope of that agreement. Defense counsel objected to Romano's proffered testimony, claiming that it was irrelevant and would improperly bolster Diaz' credibility. The trial court overruled defense counsel's objection, stating: "[Romano] can [testify to] explain [the agreement]. He can't explain if [Diaz] is going to testify truthfully, [and] he cannot bolster the credibility of [Diaz]. . . . [There are] parts of it that I don't understand, and [Romano] can explain those parts. . . . And he can testify that he negotiated this agreement on behalf of [Diaz] because of the fifth amendment [to] the [United States] constitution, and that's it." Following the ruling, Romano testified about the purpose of immunity agreements in general and the details of Diaz' immunity agreement in particular, as well as his role in negotiating the agreement for Diaz. Romano also explained the state's role in assisting Diaz to become a United States citizen. In addition, Romano opined that, when Diaz initially agreed to testify against the defendant, he did not understand his fifth amendment rights or his potential exposure to criminal prosecution arising out of his immigration status and his incriminating statements to the police concerning his fraudulent use of Suarez' identity. Finally, Romano clarified that the assistant state's attorney retained the right

to determine whether Diaz had fulfilled his obligations under the agreement and, further, that Diaz would forfeit the benefits afforded to him under the agreement if the assistant state's attorney were to determine that he had not fulfilled his promise to testify truthfully. The jury subsequently returned a guilty verdict on the assault charge.

On appeal to the Appellate Court, the defendant challenged his assault conviction on the ground that the trial court had abused its discretion in permitting Romano to testify.[5] See *State* v. *Rodriguez*, supra, 133 Conn. App. 728–32. In support of his contention, the defendant asserted that Romano's testimony was both irrelevant and prejudicial because its sole purpose and effect was to bolster Diaz' credibility. See id., 728, 731. The defendant also maintained that, because Romano represented a witness in the case, the trial court improperly permitted him to serve as a witness in the absence of a showing by the state that it had a compelling need for his testimony.[6] See id., 728 n.4. The Appellate Court rejected the defendant's claim, concluding that Romano's testimony was relevant and not unduly prejudicial because his explanation of the purpose and conditions of the immunity agreement aided the jury in understanding and evaluating Diaz' testimony in light of that agreement.[7] See id., 731–32. The Appellate Court declined to consider the defendant's contention that the state, in calling Romano as a witness, had failed to meet the compelling need standard, because the defendant had not raised that claim in the trial court. Id., 728 n.4. The Appellate Court therefore concluded that the trial court did not abuse its discretion in admitting Romano's testimony. See id., 732.

On appeal to this court following our grant of certification to appeal, the defendant renews the claims that he raised in the Appellate Court. Although Romano's testimony clearly was relevant,[8] we need not address the defendant's other reasons in support of his contention that the testimony was inadmissible because, even if we assume, without deciding, that the trial court should have excluded the testimony, its admission was harmless.

We turn to the parties' arguments with respect to harm. The defendant contends that Romano's testimony was prejudicial because it tended to bolster the credibility of Diaz, who had been impeached extensively with his admitted identity theft and his initial statement to the police that he had been confronted by two black males. The defendant further claims that the trial testimony of the state's two other key witnesses, William Ramirez and Franklin Ramirez, was not trustworthy because they initially failed to provide the police with the substance of that information despite the opportunity to do so. The defendant argues that Romano's testimony bolstering Diaz' version of the events was

important to the state's case, and therefore was likely to have affected the outcome of the trial, because the state's case rested so heavily on Diaz' credibility. We are not persuaded.

The following well established principles guide our analysis of the defendant's claim. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 56–57, 905 A.2d 1079 (2006).

We begin our evaluation with an assessment of the importance of Romano's testimony to the state's case. We acknowledge, as the defendant asserts, that it is conceivable that the jury might have misperceived Romano's willingness to testify for the state concerning his representation of Diaz as a general voucher for Diaz' credibility. Indeed, it may be said that that risk always exists when a witness' attorney testifies for the purpose of explaining the witness' testimony, especially when, as ordinarily will be the case, that testimony is corroborative of the witness' own testimony. It is also possible that Romano's testimony may have served to bolster Diaz' credibility with respect to certain specific, albeit limited, aspects of Diaz' testimony. For example, Romano testified that, before he was appointed to represent Diaz, Diaz did not appreciate the criminal implications of his admissions about his fraudulent receipt of medical services. This testimony was consistent with, and therefore tended to reinforce, Diaz' assertion that his decision to testify for the state was motivated by a desire to see the defendant brought to justice, and not made for the purpose of securing the benefits granted to him under the immunity agreement.

It is apparent, however, that the likely effect of Romano's testimony on the jury was minimal. Romano did not address any ultimate issue in the case, and at no time did he directly opine on Diaz' credibility. Furthermore, in many respects, Romano's explanation of the terms, purpose, and effect of the immunity

agreement was no less helpful to the defendant than to the state. For example, on the basis of Romano's testimony concerning the terms of the immunity agreement, the jury could have concluded that, because the determination of whether Diaz had testified in accordance with that agreement rested with the assistant state's attorney, Diaz had an incentive to curry favor with the state by falsely implicating the defendant. Indeed, during closing arguments, defense counsel urged the jury to reach this very conclusion. In addition, it was undisputed that Diaz agreed to cooperate with the state long before Romano was appointed to represent him and negotiated the immunity agreement on his behalf. Because this is strong evidence that the immunity agreement had little if anything to do with Diaz' motivation to testify against the defendant, it is difficult to see how Romano's testimony about that agreement had any material bearing on the manner in which the jury was likely to view Diaz' testimony.

Furthermore, Diaz was examined and cross-examined extensively about his fraudulent use of a social security card to obtain more than $250,000 in medical services over an extended period of time, his status as an illegal alien, and his initial identification of his assailants as two black males. Moreover, the trial court expressly instructed the jury that it was entitled to consider Diaz' unlawful conduct, stating: "It is your duty to determine whether [Diaz] is to be believed wholly, partly, or not at all. You may consider [Diaz'] prior misconduct in weighing the credibility of [Diaz] and give such weight to those facts as you decide is fair and reasonable in determining the credibility of [Diaz]." Consequently, the jury was aware that, by virtue of his previous dishonest conduct, Diaz' integrity and truthfulness were highly suspect, to say the least.

Finally, Diaz' in-court identification of the defendant as his assailant was corroborated in all respects by credible, independent evidence. Specifically, William Ramirez, who was very familiar with the defendant, testified that he was with Diaz when the assault occurred and that he observed the defendant fleeing the scene with a knife in his hand immediately after Diaz exclaimed that he had been stabbed. Another witness, Franklin Ramirez, testified that Diaz, after returning to the market immediately following the assault, told him that the defendant had stabbed him. Franklin Ramirez also stated that he had observed the defendant threaten to harm Diaz earlier that day when Diaz declined to give the defendant another $20. Finally, Franklin Ramirez testified that, nine days after the assault on Diaz, the defendant returned to the market and admitted that he had stabbed Diaz.

In sum, this strong, independent evidence that the defendant stabbed Diaz, coupled with the minimal import of Romano's testimony, causes us to conclude

that the defendant cannot establish that the admission of Romano's testimony was harmful. Compare *State* v. *Boyd*, 295 Conn. 707, 743–44, 992 A.2d 1071 (2010) (admission of prior misconduct evidence was harmless because, inter alia, state's strong case included testimony from witness who explained defendant's motive and stated that defendant had confessed his crime to her), cert. denied,     U.S.    , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011), and *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) (even if trial court improperly had admitted certain testimony, error was harmless because state's case included, inter alia, testimony of eyewitnesses who had heard defendant confess or who had observed defendant point gun at victim and flee scene shortly thereafter), with *State* v. *Finan*, 275 Conn. 60, 70–71, 881 A.2d 187 (2005) (harmful error in admitting testimony of four police officers identifying defendant as perpetrator due to substantial weight of challenged testimony and lack of credible, independent evidence of defendant's participation in crime). Accordingly, because the reliability of the verdict is not called into question by virtue of the trial court's alleged impropriety in admitting Romano's testimony, the defendant cannot prevail on his claim that he is entitled to a new trial.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] In a separate information, the defendant also was charged with threatening in the second degree in violation of General Statutes § 53a-62 (a) (2), and interfering with an officer in violation of General Statutes (Rev. to 2007) § 53a-167a. The jury found the defendant guilty of these charges, and the trial court rendered judgment in accordance with the jury's verdict. The defendant's conviction on these charges is not at issue in this appeal.

[2] The trial court imposed a total effective sentence of sixteen years imprisonment, execution suspended after eight years, and four years of probation.

[3] Diaz had been issued a temporary visa permitting his entry into the United States but had remained here after the expiration of that visa.

[4] In addition, during the investigation of the stabbing, Diaz identified himself to the police as Suarez.

[5] The defendant also raised a claim of evidentiary insufficiency with respect to the assault conviction. See *State* v. *Rodriguez*, supra, 133 Conn. App. 724. The Appellate Court rejected this claim; id., 728; which is not at issue in the present appeal.

[6] This high bar to admissibility applies to both prosecutors and defense attorneys in criminal cases. E.g., *State* v. *Peeler*, 265 Conn. 460, 474, 828 A.2d 1216 (2003) ("When either side in a criminal case seeks to call as a witness either a prosecutor or a defense attorney who is or has been professionally involved in the case, that party must demonstrate that the testimony is necessary and not merely relevant, and that all other available sources of comparably probative evidence have been exhausted. . . . This compelling need test strikes the appropriate balance between, on the one hand, the need for information and, on the other hand, the potential adverse effects on the attorney-client relationship and the judicial process in general." [Citation omitted; internal quotation marks omitted.]), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004). The defendant claimed that the compelling need test also applies to an attorney who, like Romano, represents a witness in a criminal case.

[7] More specifically, the Appellate Court explained: "We are not convinced that the court committed reversible error in admitting the testimony by Romano. Because Diaz was testifying pursuant to the immunity agreement, the jury was entitled to know its terms and the details thereof. Romano gave detailed testimony as to the purpose and conditions of the immunity

agreement, which was admitted into evidence. Romano testified that his purpose in representing Diaz was to explain the possible legal ramifications of Diaz' testimony at trial—that he could be prosecuted as a result of his statements admitting to using someone else's name and social security card and staying in the United States after his visa had expired—and that he had sought to minimize any harm to Diaz.

"Romano's testimony concerning his appointment to represent Diaz and the details of the immunity agreement was [helpful] to the jury's understanding of Diaz' presence as a witness and to [its] evaluation of his credibility. This is especially true in light of the fact that Diaz was examined and cross-examined extensively about his use of the false identity. Accordingly, we conclude that the court did not commit reversible error in permitting testimony by Romano." (Footnotes omitted.) *State* v. *Rodriguez*, supra, 133 Conn. App. 731–32.

[8] It is well established that "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient [for relevancy purposes] if it tends to support the conclusion [for which it is offered], even to a slight degree." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429, 64 A.3d 91 (2013). Romano's testimony focused on how and why Diaz' agreement with the state emerged, the nature and meaning of that agreement, and Diaz' understanding of the purpose of and need for the agreement. Romano's testimony about those matters was relevant to Diaz' credibility because the agreement and Diaz' understanding of its terms bore directly on any motive, bias, or interest that Diaz may have had in testifying for the state.