******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RUSSELL PEELER
(SC 19282)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued December 14, 2015—officially released March 8, 2016*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Emily D. Trudeau*, deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph Corradino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. This appeal requires us to consider the extent to which a criminal defendant is entitled to representation by a particular attorney at a new trial ordered in accordance with *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), as the remedy for the violation of his right to counsel of choice under the sixth amendment to the United States constitution, when that defendant has become indigent and cannot afford to retain that attorney's services for the new trial. The defendant, Russell Peeler, appeals[1] from the judgment of the trial court in two consolidated cases, rendered after a jury trial conducted on remand from this court's decision in *State* v. *Peeler*, 265 Conn. 460, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004) (*Peeler I*), convicting him of attempted murder in violation of General Statutes § 53a-49 (a) and General Statutes (Rev. to 1997) § 53a-54a (a), two counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (1), and murder in violation of General Statutes (Rev. to 1997) § 53a-54a (a). On appeal, the defendant claims that the trial court improperly failed to effectuate the remedy ordered by this court in *Peeler I* for the improper disqualification of his chosen attorney, Gary Mastronardi, when it denied his motion to require the state to pay Mastronardi's private fee rates, because he had become indigent and Mastronardi would not represent him at the new trial at the rate paid to assigned counsel by the Division of Public Defender Services (division).[2] We disagree and, accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history regarding the two consolidated cases underlying the present appeal. "In the first case, the state alleged that, on September 2, 1997, in the vicinity of 500 Lindley Street in Bridgeport, the defendant had attempted to murder Rudolph Snead, Jr., his partner in a crack cocaine operation, by shooting at [him] while in his car, and that the defendant thereby had committed risk of injury to the two minor children, Leroy Brown, Jr., and Tyree Snead, both seven years of age, who were in the backseat of [Rudolph] Snead's car during the shooting. All three of the victims were identified by name in the police arrest warrant affidavit dated September 11, 1997, and in the second substitute information filed January 20, 1998. In the second case, the state alleged that on May 29, 1998, while he was free on bond following his arrest for the drive-by shooting in the first case, the defendant, who had covered his face to conceal his identity, murdered [Rudolph] Snead at the Boston Avenue Barbershop in Bridgeport. The defendant was represented initially by Frank Riccio in connection with the first case and, thereafter, by . . . Mastronardi, who filed his appearance on July 23, 1998,

in connection with both cases.

"Following the consolidation of the two cases, on August 11, 1998, the state filed a motion for a protective order to preclude disclosure to the defense of the identity of certain witnesses, including the two minor victims, Brown and Tyree Snead. At the hearing on that motion, held on October 6, 1998, the trial court, *Ronan, J.*, provided Mastronardi with two alternatives: (1) the court would order disclosure of the names and addresses of the state's witnesses to Mastronardi, but would prohibit him from disclosing that information to the defendant; or (2) the court would grant the defendant's discovery motion with the names and addresses redacted. The court assured Mastronardi that, prior to trial, he would be able to share the information with the defendant to prepare his defense. Mastronardi advised the court that he knew that there were two minors involved in the drive-by shooting and that he and the defendant already knew their names. On December 9, 1998, the court nevertheless issued an order precluding Mastronardi from disclosing to the defendant the names and addresses of any witnesses who had given statements to the police. Pursuant to that court order, on or about December 23, 1998, [S]enior [A]ssistant [S]tate's [A]ttorney C. Robert Satti, Jr., provided Mastronardi with the statement by Brown regarding the drive-by shooting and filed with the clerk of the court notice of service of disclosure with an attached supplemental disclosure listing, inter alia, the statement given by Brown.

"Tragically, on January 7, 1999, Brown and his mother, Karen Clarke, were brutally murdered in their apartment on Earl Avenue in Bridgeport, where they recently had moved. The state thereafter charged the defendant and his brother, Adrian Peeler, in a third case with those murders, and John Walkley filed an appearance as a special public defender for the defendant in connection with the Brown and Clarke murders.[3]

"On June 9, 1999, the state moved to disqualify Mastronardi from representing the defendant in the two cases involving [Rudolph] Snead on the ground that the state intended to call Mastronardi as a witness in the defendant's capital felony case for the murder of Brown and Clarke." (Footnote altered.) Id., 463–65. After a hearing, the trial court, *Thim, J.*, granted the state's motion to disqualify Mastronardi, concluding that " 'one of the core issues in the case is . . . [what] knowledge [the defendant] had about Brown's potential testimony and when and how he obtained that knowledge.' " Id., 467. Mastronardi then returned the unearned balance of his retainer to the defendant, and the trial court then appointed Attorney Robert Sullivan as assigned counsel to represent the defendant. Id.

"Following a jury trial, the defendant was convicted of all four charges in connection with [two] cases

[involving Rudolph Snead] and sentenced to a total effective sentence of 105 years incarceration after the sentence enhancement pursuant to General Statutes § 53-202k was imposed."[4] Id., 468. The defendant appealed from the judgment of conviction directly to this court, claiming that, "in the absence of a compelling need for Mastronardi's testimony at the trial involving the Brown and Clarke homicides, the trial court improperly granted the state's motion to disqualify Mastronardi in the [two] cases [involving Rudolph Snead]. The defendant contend[ed] that he was denied his constitutional right to counsel of choice under the state and federal constitutions because the state did not demonstrate a compelling need for Mastronardi's testimony." Id., 469; see also *Wheat* v. *United States*, 486 U.S. 153, 164, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); *Ullmann* v. *State*, 230 Conn. 698, 716–17, 647 A.2d 324 (1994). This court agreed with the defendant and reversed the judgment of conviction, concluding that the improper disqualification of Mastronardi was structural error requiring a new trial. *Peeler I*, supra, 265 Conn. 475, 478.

On remand, the trial court, *Devlin, J.*, convened a status conference to determine which attorney would represent the defendant at his new trial, observing that this case was now the oldest matter pending on the judicial district's docket. Sullivan again entered an appearance on behalf of the defendant as assigned counsel, and appeared with him at that conference, at which Mastronardi also was present. The trial court stated that the defendant now appeared indigent, insofar as the division was representing him, either directly or through assigned counsel, in other pending appeals and habeas corpus matters. In response to the court's inquiry, Mastronardi stated that he did not "believe that [he] would be able" to represent the defendant, explaining that the defendant had made "substantial payments toward the trial," and that "after my disqualification, I returned all of that money to designated members of his family. So, therefore . . . I'm not holding any trial fee at all anymore, so I would not be in a position at this time to represent [the defendant]."[5] Sullivan advised the court that the defendant no longer could afford to pay Mastronardi's private rates because of his indigency, and that Sullivan did not expect the division to be willing to pay for Mastronardi to represent the defendant at those rates. Mastronardi, in turn, stated that he would not represent the defendant at the division's assigned counsel fee rates. Sullivan then stated that the defendant intended to file a motion asking the court to order the state to fund Mastronardi's private fee, or, alternatively, to dismiss the charges against the defendant.

The defendant subsequently filed that motion, asking the court either to require the state to provide funding for his counsel of choice, or, alternatively, to dismiss the charges against him.[6] At a hearing on that motion,

the parties established that the defendant was now indigent and that the division would not pay Mastronardi's private fee rates for the defendant's representation.[7] The trial court clarified its understanding that Mastronardi would not accept assigned counsel rates to represent the defendant, and stated that it would not compel him to do so. The trial court then disagreed with the defendant's claim that he was entitled to have the state pay for Mastronardi to represent him at his retrial, rejecting his argument that not doing so would render the constitutional remedy in this court's decision in *Peeler I* "meaningless" because it would mean that this court "is basically sending [the case] back to have another trial with another counsel not of his choice."[8] The trial court denied the defendant's motion, relying on *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989), to conclude that his argument "focus[ed] in on one phrase in [*Peeler I*, supra, 265 Conn. 476] to the exclusion of really a much broader context supported by a lot of law, around the country, that the right to . . . private counsel means the right to privately compensated counsel. That's our history in America. . . . [U]ntil we had public defenders, that's how people got [attorneys], they paid for them. And so I do not see the fact that [the defendant's] economic circumstances have now changed to the point where he's unable to afford counsel to be a justification for either dismissing—basically not putting him to trial on . . . this case." The trial court further denied the defendant's request for "public funding of . . . Mastronardi's fee," concluding that *Peeler I* did not require it. Accordingly, the trial court scheduled the matter for a trial at which Sullivan would represent the defendant.[9]

Subsequently, the case was tried to a jury, which returned a verdict finding the defendant guilty on all counts. The trial court, *Kavanewsky, J.*, then rendered a judgment of conviction in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of 105 years imprisonment to be served consecutive to any sentence that the defendant was currently serving. This direct appeal followed.

On appeal, the defendant argues that the trial court improperly denied his motion to require the state to pay Mastronardi's fees to represent him at his new trial, or in the alternative, to dismiss the charges against him. He contends that to "deprive him again of Mastronardi's services at retrial violates the spirit and the letter" of *Peeler I*, asking rhetorically: "What would be the point of remanding the case for a new trial because of an erroneous deprivation of his choice of counsel if [the defendant] would be represented in that trial by the same attorney who replaced his choice of counsel in the first trial?" Although the defendant acknowledges that, "if [he] had never been able to afford private counsel, he could not reject the public defender's services

and insist that public funds be used to retain a specific private attorney"; see, e.g., *Caplin & Drysdale, Chartered* v. *United States*, supra, 491 U.S. 624–25; *Wheat* v. *United States*, supra, 486 U.S. 159; he nevertheless argues that the order of this court in *Peeler I* remanding the case for a new trial because of the improper disqualification of Mastronardi, consistent with *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 150, renders this case distinguishable from that of a "typical . . . indigent defendant dissatisfied with his assigned attorney."

In response, the state contends that the defendant's requested remedy in this appeal, namely, a third trial at which Mastronardi would be paid to represent him, "goes well beyond the relief ordered" in *Peeler I*, and that the sole remedy for the violation of a criminal defendant's right to counsel of choice is a new trial, with the defendant's financial resources at that point dictating the breadth of his choice of counsel. To this end, the state emphasizes that the court's order of a new trial in *Peeler I* already afforded the defendant a "significant benefit" in the form of a "mulligan." Describing the right to counsel of choice as a "legal concept, not an individual attorney who could be dead, disbarred, retired, or simply unwilling to take on the defendant's case," the state posits that it would be "impossible to go further and guarantee the defendant [that] he would be represented by . . . Mastronardi at the retrial." Noting the lack of directly on point authority, the state relies on *United States* v. *Childress*, 58 F.3d 693 (D.C. Cir. 1995) (per curiam), cert. denied, 516 U.S. 1098, 116 S. Ct. 825, 133 L. Ed. 2d 768 (1996), for the proposition that the trial court has no duty to do anything on remand beyond inquire about whether "the previously disqualified counsel is willing to resume representation at a rate the defendant can afford, and, if the disqualified counsel is unwilling to do so, there is no error when the trial court assigns a different attorney and proceeds to trial." We agree with the state, and conclude that the defendant was not entitled to anything more than a new trial on remand, with his options for legal representation determined by the conditions existing at the time of his new trial, including whether Mastronardi was willing and able to represent him at a mutually agreeable fee.

We begin with the applicable standard of review. Whether an indigent defendant is entitled to the services of a particular attorney at a new trial ordered by an appellate court, as a remedy for the violation of his right to counsel of choice, is a question of constitutional law over which our review is plenary. See, e.g., *H. P. T.* v. *Commissioner of Correction*, 310 Conn. 606, 612–13, 79 A.3d 54 (2013).

Our analysis is guided by the following general principles concerning the right to counsel of choice under the sixth amendment to the United States constitution,

which provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his [defense]. We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him. . . . [T]he [s]ixth [a]mendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."[10] (Citations omitted; internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 144, quoting *Caplin & Drysdale, Chartered* v. *United States*, supra, 491 U.S. 624–25; *Wheat* v. *United States*, supra, 486 U.S. 159; see also, e.g., *Peeler I*, supra, 265 Conn. 471–72.

"To be sure, the right to counsel of choice is circumscribed in several important respects." (Internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 144. Significantly, "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Wheat* v. *United States*, supra, 486 U.S. 159. "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them. . . . Nor may a defendant insist on representation by a person who is not a member of the bar, or demand that a court honor his waiver of conflict-free representation. . . . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar . . . . The court has, moreover, an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." (Citations omitted; internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 151–52, citing *Caplin & Drysdale, Chartered* v. *United States*, supra, 491 U.S. 624–26; *Wheat* v. *United States*, supra, 159–60; *Morris* v. *Slappy*, 461 U.S. 1, 11–12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983).

In *Gonzalez-Lopez*, the United States Supreme Court held that "erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error."[11] (Internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 150. The Supreme Court was, however, silent about whether the defendant is constitutionally entitled to representation by his previously disqualified attorney at that new trial, regardless of any change in circumstances at that time, such as the defendant becoming indigent. See id., 152. Our rescript in *Peeler I* is similarly silent, directing remand for a "new trial" with no further qualification after concluding that "[u]nder the particular circumstances of this case, because the state did not demonstrate the compelling need for Mastronardi's

testimony . . . the appropriate remedy for this court is to order a new trial."[12] (Citation omitted.) *Peeler I*, supra, 265 Conn. 478. Indeed, as both parties recognize, this case appears to present a question of first impression nationally, as neither the parties' briefs, nor our independent research, reveals any case law directly on point.[13]

The most persuasive authority we have found in this context is the decision of the United States Court of Appeals for the District of Columbia Circuit in *United States* v. *Childress*, supra, 58 F.3d 693, on which the state relies heavily to support its argument that a defendant is not guaranteed representation by a particular attorney at a new trial ordered to remedy an earlier counsel of choice violation. *Childress* was a complex appeal that arose from three trials at which twenty-nine defendants were charged with narcotics, murder, and conspiracy charges. Id., 733–34. One of the defendants in that case, Columbus Daniels, was convicted of, inter alia, conspiracy to distribute cocaine and murder in the second and third trials, respectively, and sought reversal of his convictions on the ground that the trial court violated his right to counsel of choice by sua sponte disqualifying his retained attorney, R. Kenneth Mundy. Id. The court concluded that Mundy had been properly disqualified at the second trial, but agreed with Daniels' argument that the trial court had improperly failed to consider whether Mundy could represent him at the third trial because the possibility of the conflict was no longer present by the time of that trial. Id., 734–35. A gap in the record with respect to whether Mundy "would have been willing and able to represent Daniels [at the third] trial," however, left the court unable to determine whether the trial court had actually violated Daniels' right to choice of counsel at the third trial. Id., 735. Accordingly, the District of Columbia Circuit remanded the case to the trial court "for an inquiry into whether Mundy would have been willing and able to reenter the case," with direction to order a new trial "[i]*f*, after a hearing, the [trial] court concludes that Mundy would have reentered the case on financial terms that Daniels could have met . . . ."[14] (Emphasis added.) Id., 736.

The remedies ordered by the District of Columbia Circuit in *Childress* provide strong support for the state's argument that a defendant is not guaranteed representation by his previously disqualified attorney at his new trial. First, the court contemplated a new trial as a remedy for any counsel of choice violation, despite the fact that Mundy, the improperly disqualified attorney, had died during the pendency of Daniels' appeal and, therefore, would not be able to represent him at that new trial.[15] See id. ("Mundy's death . . . does not moot this issue because the deprivation of his counsel of choice would entitle Daniels to a reversal of his conviction as a matter of constitutional right.

. . . Mundy's death does not deprive the [trial] court of its power to grant Daniels the relief to which he would be entitled." [Citation omitted.]). Second, the court emphasized that Daniels' right to counsel of choice at a new trial would depend on his resources available at that time, stating: "Should the government elect to retry Daniels on these charges, Daniels must be afforded a reasonable opportunity to retain new counsel of choice *with his own resources* and be provided with court-appointed counsel if he proves unable to do so." (Emphasis added.) Id. Thus, *Childress* provides strong support for the proposition that the sole remedy for the violation of the defendant's right to counsel of choice is a new trial, with the defendant's entitlement to counsel of choice at that proceeding determined by conditions, financial and otherwise, existing at the time of remand.[16]

Beyond *Childress*, courts have acknowledged in other contexts that a defendant's choice of counsel at a new trial is determined by circumstances existing at that time, even when the new trial is ordered to remedy an earlier choice of counsel violation. For example, in holding that a pretrial ruling order denying a criminal defendant the right to retained counsel of choice is subject to interlocutory appeal under the Ohio statute providing for appellate review in criminal cases, the Ohio Supreme Court observed that "postconviction reversal of the trial court's judgment would not be automatically effective. *A criminal defendant might exhaust his or her resources* during the first trial, thereby denying that defendant the counsel of his or her choice." (Emphasis added.) *State* v. *Chambliss*, 128 Ohio St. 3d 507, 511, 947 N.E.2d 651 (2011); see also *State ex rel. Keenan* v. *Calabrese*, 69 Ohio St. 3d 176, 180, 631 N.E.2d 119 (1994) (Wright, J., concurring) (joining decision holding that order disqualifying criminal defense counsel is not appealable final judgment, but expressing concern that "the solution in this case that a [postconviction] appeal is an adequate remedy at law may well be illusory"), superseded by statute as stated in *State* v. *Chambliss*, supra, 510–11. Similarly, in dissenting from a decision concluding that orders disqualifying criminal defense counsel are not immediately appealable, Justice Zappala of the Pennsylvania Supreme Court described numerous "consequences of forcing a defendant to wait until after judgment to appeal a disqualification order," including that "the defendant's chosen counsel may not be available for a second trial due to illness, relocation, or other work that prevents him or her from representing the defendant in a new trial. If this is the case, then the defendant's right will have been irreparably lost. *There is also the possibility that a defendant may not have the financial resources to obtain the originally chosen attorney a second time.* Additionally, the defendant might be hesitant to confide in the new attorney after having been

stripped of his or her first attorney."[17] (Emphasis added.) *Commonwealth* v. *Johnson*, 550 Pa. 298, 310, 705 A.2d 830 (1998); see also id., 309 (deeming it "fundamentally unfair to require a defendant to proceed to trial without counsel of choice and incur the attendant counsel fees in order to vindicate on appeal the right to be represented by the attorney initially retained"). In our view, these cases concerning the efficacy of waiting until a postjudgment appeal to address potential choice of counsel violations support the state's position that the defendant's right to representation by his counsel of choice may change over time, namely, between his first trial and a new trial ordered after a successful appeal.[18]

Moreover, we agree with the state that the fact of a new trial by itself generally inures to the benefit of the defendant, regardless of who represents him at that trial. See *Morris* v. *Slappy*, supra, 461 U.S. 15 ("[t]he spectacle of repeated trials to establish the truth about a single criminal episode inevitably places burdens on the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial resources"); accord *State* v. *Payne*, 260 Conn. 446, 464–66, 797 A.2d 1088 (2002) (discussing "institutional costs" of ordering new trial as sanction for deliberate prosecutorial improprieties, including witnesses' potential unavailability and memory loss). Thus, the new trial itself serves as a sanction for the violation of the defendant's right to counsel of choice, in addition to affording the defendant another opportunity to exercise that right.

Accordingly, we conclude that, on remand for a new trial to remedy the violation of a criminal defendant's right to counsel of choice; see *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 150; the trial court is required to consider whether it is feasible to allow the defendant the attorney of his choice at that new trial. If the defendant wishes to engage the services of the attorney who previously had been unable to represent him because of the choice of counsel violation, and that attorney is willing and able to represent that defendant at his new trial under a mutually acceptable fee arrangement, including by assignment if the defendant has become indigent, the trial court should have that attorney represent the defendant at the new trial.[19] If, however, that attorney is unwilling or unable to represent the defendant at the new trial at a mutually agreeable fee, the defendant's sole relief lies in the new trial itself and the hiring or appointment of new counsel.[20] See *United States* v. *Childress*, supra, 58 F.3d 736; see also *Caplin & Drysdale, Chartered* v. *United States*, supra, 491 U.S. 624–25; *Wheat* v. *United States*, supra, 486 U.S. 159.

Turning to the record in the present case, the trial court properly protected the defendant's right to counsel of choice by considering the extent to which Mastro-

nardi was willing and able to represent the defendant at his new trial on remand from *Peeler I*. Given the court's determination that Mastronardi was not available to represent the defendant because the defendant was indigent and Mastronardi would not accept assigned counsel rates to represent him,[21] we conclude that the trial court did not violate the defendant's right to counsel of choice at his new trial by denying his funding motion.[22]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] As the parties observe, the division now refers to attorneys in private practice appointed to represent indigent criminal defendants as "assigned counsel"; it previously had referred to them as "special public defenders." In this opinion, we refer to such attorneys as assigned counsel unless quoting from judicial opinions or transcripts using the former parlance.

[3] With respect to the Brown and Clarke murders, "the defendant was convicted of one count of murder in violation of General Statutes [Rev. to 1999] § 53a-54a (a), two counts of capital felony in violation of General Statutes (Rev. to 1999) § 53a-54b (8) and (9), respectively, and one count of conspiracy to commit murder in violation of [General Statutes (Rev. to 1999) § 53a-54a (a) and General Statutes § 53a-48 (a)]." (Footnotes omitted.) *State* v. *Peeler*, 271 Conn. 338, 343–44, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005) (*Peeler II*). In convicting the defendant of these charges, the jury found that the defendant had arranged for Adrian to kill Brown and Clarke, with the aid of two other people. Id., 352–55. The state sought the death penalty, and following a penalty phase hearing, the jury deadlocked on whether to sentence the defendant to death. Id., 355–56. The trial court then denied the state's motion for a mistrial, "subsequently dismissed the penalty phase proceedings, rendered a judgment of guilty in accordance with the verdict and, merging the two capital felony counts and the murder count, sentenced the defendant to a total effective sentence of life imprisonment without the possibility of release." Id., 356–57. Following appeals by the state and the defendant from this judgment, this court affirmed the defendant's convictions in *Peeler II*, but reversed the sentence of life imprisonment without the possibility of release, and remanded the case for a new penalty phase hearing. Id., 456; see also id., 422–23 (agreeing with state's claim that trial court improperly denied its motion for mistrial and improperly instructed jury that deadlock would result in sentence of life imprisonment without parole). After a new penalty phase hearing was held on remand from *Peeler II*, a jury unanimously concluded that a death sentence was appropriate, and the trial court rendered judgment in accordance with the jury's verdict, from which the defendant again appealed to this court. That appeal remains pending before this court under Docket No. SC 18125.

[4] "Additionally, the court, [*Thim, J.*] pursuant to a motion by the state, consolidated all of the cases against the defendant with the case against his brother, Adrian Peeler, in connection with the Brown and Clarke homicides. Later, the trial court, *Ford, J.*, granted the defendant's motion to sever the cases against him involving [Rudolph] Snead from the capital felony cases against the defendant and his brother involving Brown and Clarke." *Peeler I*, supra, 265 Conn. 468.

[5] Mastronardi advised the court that he and the defendant had entered into a fee arrangement requiring the payment of separate pretrial and trial fees. He stated that he had refunded the trial portion of the fee to the defendant.

[6] The defendant also sought, and the trial court denied, dismissal on double jeopardy grounds. The defendant does not challenge that aspect of the trial court's ruling in the present appeal.

[7] There was some discussion about the amount of trial fees that Mastronardi had returned to the defendant, with the defendant arguing through Sullivan that the fee Mastronardi had negotiated at the defendant's first trial was based on dramatically different circumstances, insofar as the new trial presented far more significant discovery and trial preparation obligations.

[8] The defendant argued that the state was obligated to pay Mastronardi

to represent him because the state had created the problem by filing the original motion to disqualify Mastronardi, emphasizing that the defendant had the ability to pay Mastronardi at the time of the original motion. The defendant also argued that not paying Mastronardi to represent him would require dismissal of the charges against him because it would mean that the violation of his right to counsel of choice could not be remedied.

[9] Acknowledging the defendant's expressed intention to file an interlocutory appeal from this decision, the trial court stated that the trial date would be subject to any appellate stays. The defendant did not, however, file an interlocutory appeal; he observes in his brief in this appeal that: "In general, an order disqualifying counsel is not immediately appealable." But see footnote 18 of this opinion.

[10] In his brief, the defendant also relies on the state constitutional right to counsel. See Conn. Const., art. I, § 8. Because he does not provide any independent analysis asserting greater protections under the state constitution; see, e.g., *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992); "we deem abandoned any state constitutional . . . claim. . . . Accordingly, we analyze the defendant's . . . claim under the federal constitution only." (Citation omitted.) *State* v. *Skok*, 318 Conn. 699, 701–702 n.3, 122 A.3d 608 (2015).

[11] In so concluding, the Supreme Court observed that: "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the framework within which the trial proceeds . . . or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. [Harmless error] analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." (Citation omitted; internal quotation marks omitted.) *United States* v. *Gonzalez-Lopez*, supra, 548 U.S. 150.

[12] As the defendant recognized in arguing this case to the trial court, this court stated in the body of its opinion in *Peeler I* that, "if the trial court in the present case improperly disqualified Mastronardi, the appropriate remedy is to reverse the judgment of conviction and grant the defendant a new trial with his counsel of choice." *Peeler I*, supra, 265 Conn. 476. This court did not, however, provide in *Peeler I*: (1) any citation to support the proposition that the defendant is guaranteed the right to representation by his counsel of choice at his new trial, regardless of any change in circumstance; or (2) guidance with respect to what would happen if the defendant's chosen counsel were not available, willing, or able to represent him on remand.

[13] Our independent research reveals several decisions from other state courts with language similar to *Peeler I*, supra, 265 Conn. 476, in the body or rescript portions of opinions, stating that remand for a new trial with counsel of choice is the appropriate remedy for choice of counsel violations. See *State* v. *Roberts*, 569 So. 2d 671, 677 (La. App. 1990) (stating that remedy for improper denial of continuance to engage new attorney "is to reverse [the defendant's] conviction and sentence and remand the case for a new trial with counsel of his choice"); *People* v. *Johnson*, 215 Mich. App. 658, 670, 673, 547 N.W.2d 65 (1996) (reversing conviction and remanding case "for a new trial before a different judge in accordance with this opinion," at which "defendant may be represented by [improperly disqualified public defender] if he requests such representation"), appeal dismissed, 560 N.W.2d 638 (Mich. 1997); *Commonwealth* v. *Rucker*, 563 Pa. 347, 352, 761 A.2d 541 (2000) (stating that "[a]ppellant is entitled to a new trial with representation to be provided by his privately-retained counsel," with rescript stating that "[j]udgment of sentence [is] reversed, and a new trial [is] granted"); *Commonwealth* v. *Prysock*, 972 A.2d 539, 545 (Pa. Super. 2009) (reversing denial of motion for continuance to allow defendant to substitute retained counsel for public defender, with rescript remanding case "for a new trial with retained counsel"). Like *Peeler I*, however, none of these cases provide any guidance, either directly or through their subsequent history, with respect to further remedies should the defendant no longer be able to retain his choice of counsel on retrial.

[14] Alternatively, the District of Columbia Circuit stated: "If, on remand, the district court concludes that Mundy would not have reentered the case on terms that Daniels could have met, we hold that Daniels was not denied counsel of choice and that his murder . . . [conviction] must stand." *United States* v. *Childress*, supra, 58 F.3d 736.

[15] We note that one member of the panel in *Childress* disagreed with the majority's conclusion that Mundy's death did not moot Daniels' appeal. *United States* v. *Childress*, supra, 58 F.3d 736–37 (Williams, J., dissenting in part). The dissenting judge stated that this aspect of Daniels' appeal was moot insofar as a retrial was not an appropriate remedy because, "[o]n any retrial, there are only two possibilities for [Daniels'] representation. First, Daniels may be as unable as he was before to find someone who will represent him for what he could pay, so that he might again receive appointed counsel. In that case, the retrial would be an exact duplicate of the first one in all matters relevant to this issue. On the other hand, Daniels may now be able to arrange for paid counsel. But Daniels never claimed he was forbidden from using paid counsel other than Mundy, and a retrial under these circumstances would be responsive only to an error never claimed and give Daniels something completely different from what (by hypothesis) the trial court erroneously denied. Against the very slight value of this relief—relief that is at best only marginally responsive to the error made—stand the costs of requiring a new trial." (Emphasis omitted.) Id., 737. Thus, the dissenting judge concluded that "it would be better to let the error go uncorrected than to force the system to incur the burdens of another trial, welcome as the prospect of such a windfall may be to Daniels." Id.

[16] In a footnote in his reply brief, the defendant appears to acknowledge that his right to representation by Mastronardi at his new trial is not absolute, positing that the substitution of assigned counsel would be appropriate if Mastronardi had become "incapacitated, disbarred, or no longer willing to represent" him on remand—just as that measure would be appropriate had those events happened at the time of the first trial. See Practice Book § 3-10 (c). This concession, however, belies the weakness in the defendant's constitutional argument, which seeks the sixth amendment equivalent of time travel with respect to the restoration of his right of counsel of choice.

[17] The majority in *Commonwealth* v. *Johnson*, 550 Pa. 298, 305–306, 705 A.2d 830 (1998), did not respond to these points, stating only that: "Like the denial of a suppression motion, an order disqualifying counsel is reviewable after [a] judgment of sentence. If a judgment is obtained and it is determined on appeal that the trial court improperly removed counsel, the right to counsel of choice is not lost. There will be a new trial and the defendant will have his counsel of choice."

[18] We note that whether the granting of a motion to disqualify counsel in a criminal case is an appealable final judgment under *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983), appears to be an open question under this court's case law. See *State* v. *Vumback*, 247 Conn. 929, 932–33, 719 A.2d 1172 (1998) (*Berdon, J.*, dissenting from denial of certification) (concluding that *Burger & Burger, Inc.* v. *Murren*, 202 Conn. 660, 669–70, 522 A.2d 812 [1987], which held that disqualification of attorney in civil case is not appealable final judgment, did not overrule, in criminal cases, that aspect of *State* v. *Rapuano*, 192 Conn. 228, 229 n.1, 471 A.2d 240 [1984], which held to contrary, and that majority's decision not to grant certification "threatens the fundamental right of an accused to counsel of his choice"); but see *Peeler I*, supra, 265 Conn. 469 n.7 (discussing *Flanagan* v. *United States*, 465 U.S. 259, 269, 104 S. Ct. 1051, 79 L. Ed. 2d 288 [1984], which held that disqualification order is not appealable final judgment in federal appellate courts); *State* v. *Lantz*, 120 Conn. App. 817, 820–21, 993 A.2d 1013 (2010) (disqualification of counsel in violation of probation proceeding, which is civil matter, is not appealable final judgment). We note that the federal courts and our sister state courts are split on this question. Compare, e.g., *Flanagan* v. *United States*, supra, 269 (disqualification of criminal defense counsel is not appealable final judgment), and *Commonwealth* v. *Johnson*, supra, 550 Pa. 305–306 (same), with, e.g., *Stearnes* v. *Clinton*, 780 S.W.2d 216, 225 (Tex. Crim. App. 1989) (An interlocutory appeal is appropriate to challenge a removal of appointed counsel because "a criminal defendant should not be subjected to a trial and appeal process without the appointed counsel he had grown to accept and gain confidence in. The utilization of the appellate process in this situation to correct this particular ill would be too burdensome and would only aggravate the harm and most likely would result in a new trial compelling relator to again endure a trip through the system, creating in turn needless additional cost to the taxpayers

of this state." [Footnote omitted.]), and *State* v. *Chambliss*, supra, 128 Ohio St. 3d 511 ("a pretrial ruling removing a criminal defendant's retained counsel of choice is a final order, subject to immediate appeal").

[19] We note that the defendant expressly disclaims any argument that the trial court should have compelled Mastronardi to represent him at the assigned counsel rate. We do, however, agree with the defendant that, had Mastronardi been willing to accept assigned counsel rates, the trial court could have exercised its discretion to appoint Mastronardi to represent the defendant at his new trial—regardless of whether Mastronardi is on the assigned counsel list maintained by the Chief Public Defender pursuant to General Statutes § 51-291 (11). See General Statutes § 51-293 (a) (2) (judges to appoint assigned counsel in "an appropriate case" "[w]henever possible" from Chief Public Defender's list).

[20] We note that the defendant considers it "iron[ic]" that he was represented by Sullivan at his new trial, despite the fact that Sullivan was appointed to represent him at his first trial after the trial court had improperly disqualified Mastronardi. To this end, the defendant posits in a footnote in his reply brief that, in "light of the remand, it might be appropriate to permit [him] to request a different assigned counsel if he could find one willing to represent him who might make different strategic and tactical choices than the attorney who represented him" at the first trial. Because the defendant fails to point to anything in the record indicating his dissatisfaction with representation by Sullivan at the second trial—beyond the fact that Sullivan is not Mastronardi—we decline to consider the extent to which the defendant was entitled to different assigned counsel on remand in connection with the remedy for his counsel of choice violation.

[21] Because we conclude that the defendant was not entitled to state paid representation by Mastronardi on remand given his changed financial circumstances, we need not consider his arguments that the mechanics of such payments would be governed by *State* v. *Wang*, 312 Conn. 222, 92 A.3d 220 (2014).

[22] We briefly address the defendant's claim that he is entitled to dismissal as a remedy for the violation of his right to counsel of choice. Acknowledging that dismissal is "a harsh sanction," he posits that "it may be the only available sanction if this court rejects having his chosen counsel paid at public expense." The defendant contends that not utilizing dismissal in cases like this one "leaves the defendant without remedy and provides little disincentive for the state to attempt to disqualify counsel—if the motion is successful, by the time the case is appealed and remanded, many defendants will have exhausted their resources and be unable to exercise their right to chosen counsel on remand. The prospect of dismissal in such rare circumstances provides an alternative sanction to a violation otherwise without practical remedy." The defendant further emphasizes that dismissal is appropriate in this "unique" case because "it would not have any practical effect on the length of [his] incarceration," as he already is serving a life sentence on federal charges, and faces either the death penalty or life without parole as a result of the convictions pertaining to the murder of Brown and Clarke. See footnote 3 of this opinion. We disagree with the defendant's arguments in support of dismissal.

First, the defendant's entreaty aside, we do not have the luxury of ignoring the precedential effect of our decisions, even in apparently "unique" cases like this one. See, e.g., *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010). Second, we acknowledge that dismissal may well be an appropriate sanction for counsel of choice violations that result from severe prosecutorial impropriety. See *United States* v. *Stein*, 495 F. Supp. 2d 390, 427–28 (S.D.N.Y. 2007) (dismissing indictments against defendants, who were employees of accounting firm, because of federal prosecutors "deliberately" and "callously" took actions, pursuant to cooperation policy outlined in Department of Justice "Thompson Memorandum," to coerce, via threat of indictment, accounting firm to change its policy of paying attorney's fees for personnel, which had effect of depriving defendants of their counsel of choice in complex tax fraud case); accord *State* v. *Lenarz*, 301 Conn. 417, 451, 22 A.3d 536 (2011) (ordering dismissal to avert "miscarriage of justice" when "prosecutor clearly invaded privileged communications that contained a detailed, explicit road map of the defendant's trial strategy" and failed to disclose invasion before trying "case to conclusion more than one year after the invasion occurred"), cert. denied,     U.S.    , 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012). Although a majority of this court determined in *Peeler I* that the trial court had abused its discretion in ruling on the state's disqualification motion, the record in this case does not disclose even a colorable claim of

egregious and severe prosecutorial interference with the defendant's right to choice of counsel that would warrant dismissal, insofar as the state's disqualification motion was consistent with the prosecutor's duty to act in good faith to "protect the case against conflicts of interest"—the discharge of which requires the prosecutor to notify the court of the existence of "potential conflicts of interest" that affect defense counsel's representation of the defendant. *United States* v. *McKeighan*, 685 F.3d 956, 969 (10th Cir.), cert. denied, U.S. , 133 S. Ct. 632, 184 L. Ed. 2d 411 (2012).

---